1  Rocky K. Copley, SBN 101628
   LAW OFFICE OF ROCKY K. COPLEY
2  550 West "C" Street, Ste. 1150
   San Diego, CA 92101
3  Tel: (619) 232-3131; Fax: (619) 232-1690

4  Charles S. LiMandri, SBN 110841
   Sterling J. Stires, SBN 199218
5  LAW OFFICES OF CHARLES S. LiMANDRI, APC
   P.O. Box 9120
6  Rancho Santa Fe, California  92067
   Tel:  (858) 759-9930; Fax: (858) 759-9938

7
   Attorneys for Movants MISSION BAY JET SPORTS, LLC
8  and ROBERT ADAMSON

9

10             UNITED STATE DISTRICT COURT

11           SOUTHERN DISTRICT OF CALIFORNIA

12  IN THE MATTER OF THE COMPLAINT )   CASE NO. 08cv0146 JM (CAB)
    OF MISSION BAY JET SPORTS, LLC; )
13  ROBERT ADAMSON, individually and )  **LIMITATION PETITIONERS'**
    d.b.a. MISSION BAY JET SPORTS, FOR )  **MEMORANDUM OF POINTS AND**
14  EXONERATION FROM OR             )   **AUTHORITIES IN OPPOSITION TO**
    LIMITATION OF LIABILITY,         )   **HALEY COLOMBO AND JESSICA**
15                                    )   **SLAGEL'S MOTION TO DISMISS**
                                      )   **COMPLAINT**
16                                    )
              Limitation Petitioners. )   Date:        April 18, 2008
17                                    )   Time:        1:30 p.m.
                                      )   Dept.:       16
18                                    )   Magistrate:  Hon. Cathy Ann Bencivengo
                                      )   Judge:       Hon. Jeffrey T. Miller
19  ─────────────────────────────────)

20        Limitation Petitioners, MISSION BAY JET SPORTS, LLC and ROBERT ADAMSON,

21  individually and doing business as MISSION BAY JET SPORTS (hereinafter collectively

22  referred to as "MISSION BAY JET SPORTS"), hereby submit the following Memorandum of

23  Points and Authorities in Opposition to Haley Colombo and Jessica Slagel's Motion to Dismiss

24  as follows:

25  / / /

26  / / /

27  / / /

28  / / /

─────────────────────────────────────────────
OPPOSITION TO MOTION TO DISMISS COMPLAINT
                              CASE NO.: 08cv0146 JM (CAB)

# TABLE OF CONTENTS

I.  STANDARDS FOR A RULE 12(b)(1) MOTION TO DISMISS . . . . . . . . . . . . . . . . 1

II.  THIS COURT HAS ADMIRALTY JURISDICTION IN THIS CASE . . . . . . . . . . . 2

    A.  The Accident Occurred on Navigable Waters . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.  The Claimants Were Engaged in a "Traditional Maritime Activity" . . . . . . . . 5

        1.  The Potentially Disruptive Impact on Maritime Commerce . . . . . . . . . 6

        2.  The Claimants Activity Had a Substantial Connection to a
           Traditional Maritime Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.  THE LIMITATION OF LIABILITY ACT OF 1851 APPLIES TO THE
     PRESENT MATTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.  Standard of Review for Rule 12(b)(6) Motion to Dismiss . . . . . . . . . . . . . . 10

    B.  MISSION BAY JET SPORTS Has Properly Pled the Limitation
       of Liability Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.  The Limitation of Liability Applies to the Present Case . . . . . . . . . . . . . . . . 12

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

OPPOSITION TO MOTION TO DISMISS COMPLAINT
CASE NO.: 08cv0146 JM (CAB)

# TABLE OF AUTHORITIES

**U.S. Supreme Court Cases**:

Conley v. Gibson ............................................................ 10
  355 U.S. 41 (1957)

Coryell v. Phipps (The Seminole) ............................. 14
  317 U.S. 406 (1943)

Foremost Ins. Co. v. Richardson ....................... 2, 6, 7, 8, 9, 14
  457 U.S. 668 (1982)

Grubart v. Great Lakes Dredge & Dock Co.  ..................... 8
  513 U.S. 527 (1995)

Just v. Chambers ......................................................... 14
  312 U.S. 383 (1941)

Yamaha Motor Corp. v. Calhoun  ................................ 8
  516 U.S. 199 (1996)

**Federal Cases:**

Adams v. Montana Power Co. ......................................... 4
  528 F.2d 437 (9th Cir. 1975)

Balistreri v. Pacifica Police Dept. ........................... 10, 12
  901 F.2d 696 (9th Cir. 1990)

Complaint of Beesley's Point Sea-Doo, Inc.  ................... 14
  956 F.Supp. 538 (D.N.J. 1997)

Crosson v. Vance .......................................................... 7
  484 F.2d 840 (4th Cir. 1973)

Everest & Jennings, Inc. v. American Motors Ins. Co.  ............ 10
  23 F.3d 226 (9th Cir. 1994)

Farrell Lines, Inc. v. Jones .......................................... 12
  530 F.2d 7 (5th Cir. 1976)

Foulk v. Donjon Marine Co. .......................................... 2
  144 F.3d 252 (3rd Cir. 1998)

Hogan v. Overman ......................................................... 7
  767 F.2d 1093 (4th Cir. 1985)

H20 Houseboat Vacations v. Hernandez  ......................... 4
  103 F.3d 914 (9th Cir. 1996)

In re Complaint of Royal Caribbean Ltd. ......................... 14
  459 F.Supp.2d 1275 (S.D. Fla. 2006)

iii

# TABLE OF AUTHORITIES

**Federal Cases:**

In re Fun Time Boat Rental & Storage, LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6
    431 F.Supp.2d 993 (D. Ariz. 2006)

In the Matter of the Complaint of Hechinger . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13
    890 F.2d 202 (9th Cir. 1989)

In the Matter of the Complaint of Paradise Holdings, Inc. . . . . . . . . . . . . . . . . . . . . . 4, 6
    795 F.2d 756 (9th Cir. 1986)

In re Strahle . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 14
    250 F.Supp.2d 997 (N.D. Ind. 2003)

In re Young . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    872 F.2d 176 (6th Cir. 1989)

Keys Jet Ski, Inc. V. Kays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    893 F.2d 1225 (11th Cir. 1990)

LeBlanc v. Cleveland . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    198 F.3d 353 (2d Cir. 1999)

Luna v. Star of India . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    356 F.Supp. 59 (S.D. Cal. 1973)

Mink v. Genmar Industries, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    29 F.3d 1543 (11th Cir. 1994)

Oliver v. Hardesty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9
    745 F.2d 317 (4th Cir. 1984)

Parks v. School of Business, Inc. v. Symington . . . . . . . . . . . . . . . . . . . . . . . . 10, 12
    51 F.3d 1480 (9th Cir. 1995)

Peloza v. Capistrano Unified School Dist. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    37 F.3d 517 (9th Cir. 1994)

Petition of M/V Sunshine, II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    808 F.2d 762 (11th Cir. 1987)

Richards v. Blake Builders Supply, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14
    528 F.2d 745 (4th Cir. 1975)

Roberts v. Corrothers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    812 F.2d 1173 (9th Cir. 1987)

St. Hilaire Moye v. Henderson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    496 F.2d 973 (8th Cir. 1974)

/ / /

/ / /

OPPOSITION TO MOTION TO DISMISS COMPLAINT

CASE NO.: 08cv0146 JM (CAB)

# TABLE OF AUTHORITIES

**Federal Cases:**

Szollosy v. Hyatt Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 14
  208 F.Supp.2d 205 (D. Conn. 2002)

Three Buoys Houseboat Vacations U.S.A. v. Morts  . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
  921 F.2d 775 (8th Cir. 1990)

Valdez v. U.S. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
  837 F.Supp. 1065 (E.D. 1993)

Waggoner v. Nags Head Water Sports, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  141 F.3d 1162 (4th Cir. 1998)

Warren v. Fox Family Worldwide, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
  328 F.3d 1136 (9th Cir. 2003)

**Other Cases:**

Hodges v. Summer Fun Rentals, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
  2006 WL 2927419 (9th Cir. 2006)

In re Waterfront License Corp. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
  2005 A.M.C. 2013 (S.D. Fla. 2005)

Tassinari v. Key West Water Tours, L.C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
  2007 WL 1879172 (S.D. Fla. 2007)

**Federal Statutes:**

Federal Rule of Civil Procedure 8  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Federal Rule of Civil Procedure 9(h)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Federal Rule of Civil Procedure 12(b)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15

Federal Rule of Civil Procedure 12(b)(6)  . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10, 15

Federal Rule of Civil Procedure 15(a)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Supplemental Rules for Certain Admiralty and Maritime Claims, Rule A(2)  . . . . . . . . . . . . 3

Supplemental Rules for Certain Admiralty and Maritime Claims, Rule F  . . . . . . . . 2, 3, 12, 15

Supplemental Rules for Certain Admiralty and Maritime Claims, Rule F(2)  . . . . . . . . . . . 11

33 C.F.R. § 165.1122  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

33 C.F.R. § 2.36(a)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

///

# **TABLE OF AUTHORITIES**

**Other Authority**:

House Report 109-170, H.R.Rep. 109-170, p. 990-994, July 14, 2005 . . . . . . . . . . . . . . . . . .  13

Limitation of Liability Act, 46 U.S.C. 30501  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

The Limitation of Liability Act, 46 U.S.C.A 30505(b)  . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

2008 United States Coast Pilot 7, 2008   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

OPPOSITION TO MOTION TO DISMISS COMPLAINT

CASE NO.: 08cv0146 JM (CAB)

# I.

## STANDARD OF REVIEW FOR A RULE 12(b)(1) MOTION TO DISMISS.

The only known potential Limitation claimants, HALEY COLOMBO and JESSICA SLAGEL (hereinafter collectively referred to as "Claimants") have filed a Motion to Dismiss the Complaint. The Claimants are not yet parties to this action because they have not filed claims, nor have they filed an Answer to the Complaint. The Claimants are attacking MISSION BAY JET SPORT's Limitation of Liability Act Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(1) and pursuant to Federal Rule of Civil Procedure 12(b)(6). In their Motion to Dismiss, the Claimants are asserting that the Court does not have admiralty jurisdiction over this matter, and that the Limitation of Liability Act (sometimes referred to as "LOLA" herein) does not apply to the underlying accident in which the Claimants were injured. For reasons set forth herein, the Court has admiralty jurisdiction over the present matter, and the Claimants' Motion to Dismiss should be denied in its entirety.

The Claimants assert that, facially and factually, the allegations in the Complaint fail to allege grounds for federal subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1). In deciding a Rule 12(b)(1) motion to dismiss, based on a "facial attack," the Court must consider the allegations of the complaint as true. Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003). In deciding a 12(b)(1) motion to dismiss, based on a "factual attack," the Court may look to extrinsic evidence, and weigh conflicting evidence to determine the facts that establish jurisdiction. Valdez v. U.S., 837 F.Supp. 1065, 1067 (E.D. 1993); aff'd at 56 R.3d 1177 (9th Cir. 1995). Where jurisdiction is intertwined with the merits, the Court must "assume the truth of the allegations in a complaint ... unless controverted by undisputed facts in the record." Roberts v. Corrothers, 812 F.2d 1173, 1177 (9th Cir. 1987).

In the present matter, the Claimants argue that there is no subject matter jurisdiction because the area in Mission Bay where the accident occurred is not "navigable waters" under maritime law. Further, the Claimants argue that they were not engaged in a "traditional maritime activity." As set forth herein, maritime jurisdiction applies to Mission Bay, including

1

1  the alleged accident scene, and the Claimants were certainly engaged in a "maritime activity"

2  as defined by maritime law. The Claimants simply misunderstand admiralty jurisdiction and

3  the Limitation of Liability Act. Further, the Claimants misapply and mislead the Court with

4  regard to the applicable maritime law.

**II.**

**THIS COURT HAS ADMIRALTY JURISDICTION IN THIS CASE.**

7  The U.S. Supreme Court has held that admiralty jurisdiction extends to cases of damage

8  or injury on navigable waters where the wrong bears a significant relationship to traditional

9  maritime activity. <u>Foremost Ins. Co. v. Richardson</u>, 457 U.S. 668, 676-677 (1982). MISSION

10  BAY JET SPORTS does not dispute that the underlying accident occurred in Mission Bay, or

11  that the underlying accident occurred while the Claimants were riding on a personal water craft.

12  However, MISSION BAY JET SPORTS does dispute the Claimants' contention that the area

13  in which the accident occurred is "navigable waters" for admiralty jurisdiction purposes.

14  Furthermore, the Claimants were engaged in a "traditional maritime activity" when the

15  underlying accident took place.

16  The Claimants contend that MISSION BAY JET SPORTS has not sufficiently pled the

17  Court's admiralty jurisdiction. However, the plaintiff does not even have to specifically cite to

18  Federal Rule of Civil Procedure 9(h) to invoke admiralty jurisdiction as long as the plaintiff

19  identifies admiralty as a jurisdictional basis in the complaint. <u>Foulk v. Donjon Marine Co.</u>, 144

20  F.3d 252 (3rd Cir. 1998). MISSION BAY JET SPORTS did plead Rule 9(h), and identified

21  admiralty as the jurisdictional basis in the complaint. Further, MISSION BAY JET SPORTS

22  cited to the Limitation of Shipowners Liability Act, and to the Supplemental Rules for Certain

23  Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, as the basis for

24  admiralty jurisdiction. As discussed in detail herein, the pleading requirements of

25  Supplemental Rule F, regarding limitation of liability, were also met by MISSION BAY JET

26  SPORTS.

27  MISSION BAY JET SPORTS does not need to prove its LOLA case in its pleadings.

28  The Federal Rules of Civil Procedure apply to this matter as do the Supplemental Rules for

2

1  Certain Admiralty and Maritime Claims.  Supplemental Rule A(2) states: "The Federal Rules
2  of Civil Procedure also apply to the foregoing proceedings to the extent that they are
3  inconsistent with these Supplemental Rules."  There is no requirement in the Federal Rules of
4  Civil Procedure, or in the Supplemental Rules that plaintiffs must prove their case at the
5  pleading stage.  The pleading requirements are set forth in Federal Rule of Civil Procedure 8,
6  and in Supplemental Rule F (applicable to Limitation of Liability claims).

7  **A.    The Accident Occurred on Navigable Waters.**

8         In its Complaint, MISSION BAY JET SPORTS pled that the underlying accident
9  occurred on the navigable waters of Mission Bay, and that the Court has admiralty jurisdiction
10  within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and the Supplemental
11  Rules for Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.  Federal
12  Rule 9(h) and Supplemental Rules A and F apply to cases in which the Limitation of Liability
13  is pled.

14         The Claimants allege that the situs of the subject accident is not "navigable waters" as
15  defined by maritime law.  Specifically, the Claimants alleged that the accident took place in the
16  "personal water craft area" of Mission Bay.  The Claimants cite to the case of LeBlanc v.
17  Cleveland, 198 F.3d 353 (2d Cir. 1999) to support their assertion that the situs is not navigable.
18  However, and as the court in the LeBlanc case stated: "Navigability requires that the body of
19  water be **capable** of supporting commercial maritime activity."  Id. at 360 (emphasis added).
20  In LeBlanc, the court held that the "navigable waters" requirement was not satisfied in that case
21  because the accident occurred in an area of the Hudson River that was completely inaccessible
22  to the ocean because of the existence of several impassible waterfalls over 30 feet high.  Id.
23  Therefore, the area was not capable of supporting maritime commerce.  In the present matter,
24  however, Mission Bay is directly open to the Pacific Ocean, and actually does support maritime
25  commerce.  Even from the area that the Claimants allege the accident took place, the Pacific
26  Ocean is completely and readily accessible.

27         Claimants do not seem to realize that commercial maritime activity takes place on
28  Mission Bay every day, and also takes place where they claim the accident occurred.  (See,

3

Declaration of Roy "Buck" Everingham, filed concurrently herewith). When people rent personal water craft in Mission Bay, such as Jet Skis and Sea-Doos, they are engaged in maritime commerce. Those who rent these water craft, use the "personal water craft area" to operate the rented Sea-Doos and Jet Skis. Not only is the situs *capable* of supporting maritime commerce, it actually is used for maritime commerce.

Admiralty jurisdiction extends to all waters which are actually navigable, connecting with other states or foreign countries, and traversed by commercial craft. <u>Adams v. Montana Power Co.</u>, 528 F.2d 437 (9th Cir. 1975). In the present matter, it is undisputed that Mission Bay is open and connected to the Pacific Ocean, which borders California, Oregon, Washington, Alaska and Hawaii, and far too many countries to name here. The area in which the accident took place is called the "North Pacific Passage." (<u>See</u>, Exhibit 1 to Claimants' Lodgment of Exhibits in Support of Motion to Dismiss Complaint - note that the exhibit is a fold-out map of Mission Bay). One can easily navigate a vessel from the passage to the Pacific Ocean. Using this analysis, the Ninth Circuit has held that even Lake Havasu, a recreational lake that is part of the Colorado River and located over 200 miles inland, is a "navigable water" for admiralty jurisdiction purposes. <u>H20 Houseboat Vacations v. Hernandez</u>, 103 F.3d 914 (9th Cir. 1996); see also, <u>In re Fun Time Boat Rental & Storage, LLC</u>, 431 F.Supp.2d 993 (D. Ariz. 2006).

Historically, waters that are subject to the ebb and flow of the tides are considered to be within the "navigable waters" of the United States. In the case of <u>In the Matter of the Complaint of Paradise Holdings, Inc.</u>, 795 F.2d 756, 759 (9th Cir. 1986), the Ninth Circuit Court of Appeals considered this very analysis to determine that admiralty jurisdiction applied to the case where a cruise ship struck and injured a body surfer in shallow waters. This is consistent with the federal regulations regarding the jurisdiction of the United States Coast Guard. Specifically, the federal statutory definition of "navigable waters" states that navigable waters include the "Internal waters of the United States that are subject to tidal influence." 33 C.F.R. § 2.36(a)(2). Furthermore, **the federal government has designated "all waters of . . . Mission Bay" as a regulated navigation area**. 33 C.F.R. § 165.1122 (emphasis added). The

4

1   National Oceanic and Atmospheric Administration has even included Mission Bay in the
2   official navigation charts for the federal government in Chart No. 18765.  (See, excerpts of the
3   United States Coast Pilot 7 (2008) attached hereto as Exhibit "A", at p. 270).

4          Mission Bay is open to the Pacific Ocean, and the entire bay, including the accident site,
5   is subject to the ebb and flow of the tides.  All of Mission Bay is statutorily deemed navigable
6   waters by the federal government, and Mission Bay is capable of supporting commercial
7   maritime activity.  In fact, Mission Bay does actively support commercial maritime activity,
8   such as marina slip rentals, fishing boat rentals and sales, sailboat rentals and sales, and other
9   maritime activity.  The capability of supporting maritime commerce certainly applies to the
10  area where the rented vessels operate.

11         The Claimants rely on the case of Three Buoys Houseboat Vacations U.S.A. v. Morts,
12  921 F.2d 775 (8th Cir. 1990) in their argument that Mission Bay is not "navigable."  However,
13  the Claimants failed to inform the Court that the waterway involved in the Three Buoys case
14  was the Lake of the Ozarks.  The court in Three Buoys held that the Lake of the Ozarks was
15  not "navigable waters" because of the existence of the Bagnell Dam, it is not open to the sea,
16  and because the waterway was entirely within the state of Missouri.  Id. at 779.  In the present
17  matter, Mission Bay is not dammed, and is open to the Pacific Ocean.  Clearly, Claimants' fail
18  to recognize the reasoning behind the decision in Three Buoys.

19         Pursuant to the foregoing, MISSION BAY JET SPORTS respectfully requests the Court
20  to deny the Claimants' Motion to Dismiss.  Mission Bay, including the area where the
21  Claimants allege the accident occurred, is "navigable waters" within the definition of maritime
22  law.  This was accurately and adequately pled by MISSION BAY JET SPORTS in its
23  Complaint.

24  **B.      The Claimants Were Engaged in a "Traditional Maritime Activity."**

25         MISSION BAY JET SPORTS pled in its Complaint that the accident occurred while
26  Bret Kohl was operating a Sea-Doo personal water craft in the navigable waters of Mission
27  Bay, and that the Claimants were passengers on that Sea-Doo when they received injuries.
28  (See, Complaint for Exoneration from or Limitation of Liability, at paras. 6 through 12).

5

According to the United States Supreme Court, a passenger injured aboard a pleasure boat on navigable waters places the alleged tort within admiralty jurisdiction. <u>Foremost Ins. Co. v. Richardson</u>, 457 U.S. 668, 676-677 (1982). As noted above, the area where the accident occurred was "navigable waters." As such, and because the Claimants were passengers aboard a pleasure boat, there is admiralty jurisdiction.

### 1.    The Potentially Disruptive Impact on Maritime Commerce.

The Claimants assert that there is no admiralty jurisdiction because the subject accident could not, or did not, have a disruptive impact on maritime commerce. Courts have routinely held that admiralty jurisdiction applies to passengers who have fallen in the water off of a vessel (such as the present case) and other cases where swimmers were injured in navigable waters. <u>Mink v. Genmar Industries, Inc.</u>, 29 F.3d 1543 (11th Cir. 1994); <u>In re Fun Time Boat Rental & Storage</u>, *supra*; <u>In the Matter of the Complaint of Paradise Holdings, Inc.</u>, *supra*. As discussed herein, courts have also routinely held that admiralty jurisdiction applies to personal water craft accidents.

The U.S. Supreme Court has held, in the case of <u>Foremost Ins. Co. v. Richardson</u>, 457 U.S. 668, 675 (1982), that where an accident has the potential to disrupt maritime commerce, admiralty jurisdiction applies. In the <u>Foremost</u> case, two recreational vessels collided on a Louisiana river. In granting admiralty jurisdiction, the Supreme Court reasoned that if the collision had occurred in a shipping channel, maritime commerce *could potentially* have been disrupted. <u>Id</u>. In the present case, had the Claimants fallen overboard in a shipping channel, near a rental dock, near a marina, or where Coast Guard rescue was required, or where the bay had to be closed for search and rescue purposes, maritime commerce could certainly have been disrupted. There are a myriad of scenarios where a passenger falling off of a personal water craft, such as in the instant matter, could disrupt maritime commerce. This is exactly what the court held in the case of <u>Szollosy v. Hyatt Corp.</u>, 208 F.Supp.2d 205 (D. Conn. 2002).

In the <u>Szollosy</u> case, a young child, who was operating a personal water craft, crashed into a breakwater just moments after he boarded the vessel. The court held that "it is apparent that the incident at issue had a potential for disrupting maritime commerce. A young child's

6

1 allegedly untrained and unaccompanied ride of a jet ski in navigable waters clearly poses a

2 hazard to navigation." Id. at 212. In granting maritime jurisdiction, the court opined that

3 emergency treatment of the injured child could have possibly disrupted maritime commerce.

4 Id.

5      Clearly, under the U.S. Supreme Court's reasoning in Foremost, supra, the present

6 accident falls within the Court's admiralty jurisdiction because the potential disruption of

7 maritime commerce existed under the circumstances alleged in this case.

8     **2.**     **The Claimants Activity Had a Substantial Connection to a Traditional**

9             **Maritime Activity.**

10      In support of their assertion that there is not a substantial connection to a traditional

11 maritime activity, the Claimants, among other things, rely on the case of Crosson v. Vance, 484

12 F.2d 840 (4th Cir. 1973). In that case, the court held that there was no admiralty jurisdiction

13 where a water skier sued the operator of the tow boat for personal injuries that occurred in

14 shallow waters. However, the Claimants fail to inform the Court that the Crosson case has

15 been abandoned by the Fourth Circuit, and is no longer good law. Hogan v. Overman, 767

16 F.2d 1093 (4th Cir. 1985).

17      In Hogan, supra, which, like Crosson, involved a water skier alleging negligence on the

18 part of the tow boat operator, the court held that navigation of a vessel, including a water ski

19 boat, is fundamentally and unquestionably a "traditional maritime activity." The court found

20 that because the injured water skier simply alleged negligent operation of the vessel by the

21 defendant, the defendant's motion to dismiss for lack of admiralty jurisdiction was improperly

22 granted. Hogan, supra, 767 F.2d at 1094. The Hogan court stated:

23             **The complaint, though unspecific, alleges negligent operation of**

            **a motorboat, which, defendant's counsel concedes, can be**

24             **construed as a general allegation of navigational error. Such a**

            **complaint is not vulnerable to a motion to dismiss for lack of**

25             **jurisdiction.**

26 Id. (Emphasis added). In the present matter, the Claimants readily assert that the accident

27 occurred because the operator, Brett Kohl, negligently operated the vessel. (See, Claimants'

28 Motion to Dismiss, at p. 4, l. 7).

1    The operation of the subject vessel is at the heart of the Claimants' claims against the

2  operator, Brett Kohl and MISSION BAY JET SPORTS.  Operation and navigation of a vessel

3  are traditional maritime activities.  Indeed, the U.S. Supreme Court has held that the navigation

4  and operation of a vessel, whether of a commercial or non-commercial nature, clearly fall

5  within the "substantial relationship" requirement.  Grubart v. Great Lakes Dredge & Dock Co.,

6  513 U.S. 527, 540 (1995); citing  Foremost, *supra*.  There is no doubt that, as a matter of law,

7  admiralty jurisdiction applies in this case.

8    The United State Supreme Court held in Yamaha Motor Corp. v. Calhoun, 516 U.S.

9  199, 206 (1996), that admiralty jurisdiction applied to a jet ski accident.  In Yamaha, a 12 year-

10  old girl died in a tragic jet ski accident when the vessel she was riding struck an anchored boat

11  in Puerto Rico.  Id. at 202.  The Supreme Court was asked to decide whether federal maritime

12  law regarding wrongful death applied in that case.  Id. at 205.  In ruling that the federal

13  admiralty wrongful death laws did apply, the Court held that the jet ski was a "water craft"

14  involved in an accident in navigable waters.  Id.  Thus, admiralty jurisdiction applied.

15    In the case of In re Strahle, 250 F.Supp.2d 997, 1002-1003 (N.D. Ind. 2003), the court

16  held that negligent navigation of a personal water craft on a navigable river had sufficient

17  "nexus" to traditional maritime activities to sustain admiralty jurisdiction over the owner's suit

18  for exoneration from or limitation of liability in connection with a wrongful death suit

19  involving his vessel.[1]  As noted, and as asserted by the Claimants, the alleged negligent act in

20  the present matter is the negligent operation of the personal water craft.

21    In Oliver v. Hardesty, 745 F.2d 317 (4th Cir. 1984), where an injured swimmer alleged

22  that the defendant caused his injury through negligent operation of a boat, the court held that

23  the incident had a significant relationship to traditional maritime activities sufficient to sustain

24

25    [1]    It should be noted that in In re Strahle, 250 F.Supp.2d 997, when deciding whether the
26  Wabash River was "navigable" for admiralty jurisdictional purposes, the court considered it a
   "significant factor" that various governmental agencies (i.e., Army Corps of Engineers; U.S. Division
27  of Hydropower Administration) concluded that the river was a "navigable waterway."  In the present
   case, and as noted above, the federal government has statutorily deemed that all waters of Mission Bay
28  are regulated navigable waters.  33 C.F.R. § 165.1122.

8

admiralty jurisdiction. Id. at 320. Specifically, the court held that the because the Supreme Court had recognized the importance of navigation in establishing a sufficient nexus for admiralty jurisdiction in Foremost, supra, the alleged "negligent operation" of the defendant's vessel was sufficient to establish admiralty jurisdiction. Id.

In St. Hilaire Moye v. Henderson 496 F.2d 973, 979 (8th Cir. 1974) the court ruled that the **"operation of a boat on navigable waters, no matter what its size or activity, is a traditional maritime activity to which the admiralty jurisdiction of the federal courts may extend."** In that case, a recreational sailor brought an action against fellow passengers to recover damages for serious injuries which resulted when the boat in which he was sailing stopped suddenly throwing him into the water. Id. at 974.

This very Court, the Southern District of California, in Luna v. Star of India, 356 F.Supp. 59 (S.D. Cal. 1973), in considering the "maritime nexus" issue, held that the nexus requirement was met and admiralty jurisdiction applied when a woman slipped and fell down stairs aboard the docked museum ship, the Star of India. If a claim where a woman sustained injuries in a slip and fall on board a docked museum ship falls within the Court's admiralty jurisdiction, the present case certainly does as well.

It is abundantly clear that all of Mission Bay, including the personal water craft area, is a "navigable" waterway for admiralty jurisdictional purposes. Further, the law is clear that passengers who fall in the water, or even swimmers, have the potential to disrupt maritime commerce. Finally, because the operation of the vessel in the subject accident is involved and implicated in this matter, the "traditional maritime activity" requirement is clearly met. Pursuant to the foregoing, MISSION BAY JET SPORTS respectfully requests that the Court dismiss the Claimants' Motion to Dismiss, and find that admiralty jurisdiction applies to this matter.

///

///

///

///

### III.

### <u>THE LIMITATION OF LIABILITY ACT OF 1851 APPLIES</u>
### <u>TO THE PRESENT MATTER.</u>

The Claimants contend that MISSION BAY JET SPORTS has not properly pled the Limitation of Liability Act in their Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6). Further, it appears that the Claimants believe that MISSION BAY JET SPORTS must prove its case in the pleading stage. Clearly, the Claimants have a fundamental misunderstanding of the proceedings and procedures involved in a Limitation action. Finally, the Claimants contend that the Limitation of Liability Act does not apply in the present matter because the underlying accident involves a personal water craft.

**A.    Standard of Review for Rule 12(b)(6) Motion to Dismiss.**

In its consideration of a motion to dismiss, the Court is required to "take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." <u>Parks v. School of Business, Inc. v. Symington</u>, 51 F.3d 1480, 1484 (9th Cir. 1995); <u>Everest & Jennings, Inc. v. American Motors Ins. Co.</u>, 23 F.3d 226, 228 (9th Cir. 1994). The Court must assume that all general allegations in the complaint "embrace whatever specific facts might be necessary to support them." <u>Peloza v. Capistrano Unified School Dist.</u>, 37 F.3d 517, 521 (9th Cir. 1994). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957). Also, if a motion to dismiss is granted, "the standard for leave to amend is generous," and such leave must be "freely granted when justice so requires." <u>Balistreri v. Pacifica Police Dept.</u>, 901 F.2d 696, 701 (9th Cir. 1990); F.R.C.P. 15(a).

Because MISSION BAY JET SPORTS pled in its Complaint that all Limitation Petitioners were without "privity and knowledge" of the circumstances that caused the subject accident, the Court must assume that this is true. (See, Complaint, at p. 4, para. 13). Furthermore, the Court must assume that the details of the vessel and of the accident are true, as well.

**B.    MISSION BAY JET SPORTS has Properly Pled the Limitation of Liability Act.**

Under the Limitation of Liability Act, 46 U.S.C. 30501, et seq., a vessel owner faced with liability arising out of a single voyage may petition the appropriate federal district court for exoneration from liability or limitation of liability to the value of the vessel itself. In the Matter of the Complaint of Hechinger, 890 F.2d 202, 206 (9th Cir. 1989). The court, once it obtains security of the vessel, or for the amount of the vessel's value, from the petitioner, may enjoin all claimants from maintaining separate suits and require them to file all of their claims in the limitation proceeding. Id. The court then determines whether the vessel owner is liable to any of the claimants and, if so, whether the vessel owner's liability is limited under the Limitation of Liability Act to the value of the vessel. Id. Based on these determinations, the court may apportion the value of the ship among the claimants.

Rule F(2) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure requires the complaint to "set forth facts on the basis of which the right to limit liability is asserted, and all facts necessary to enable to the court to determine the amount to which the owner's liability should be limited." Further, Supplemental Rule F(2) requires the complaint to plead the description of the vessel, plead the date of the voyage on which the accident occurred, describe the known claims, and it must include a claim for lack of privity and knowledge.

In the present case, MISSION BAY JET SPORTS pled that Haley Colombo and Jessica Slagel were injured when they fell from MISSION BAY JET SPORTS' Sea-Doo that Brett Kohl was operating on July 29, 2007 in Mission Bay. (See, Complaint, p. 3, para. 6 through p. 4, para. 13). MISSION BAY JET SPORTS pled that the Blue Book value of the subject Sea-Doo personal water craft is $6,005. (See, Complaint, p. 5, para. 18). In fact, MISSION BAY JET SPORTS deposited this exact amount with the Court when it filed its *Ad Interim* Stipulation. MISSION BAY JET SPORTS accurately pled the description of the subject Sea-Doo, pled the lack of privity and knowledge and described all of the possible known claims. (See, Complaint, at p. 2, para. 4, P. 3, para. 9, and p. 4, para. 13).

/ / /

11

1    There can be no doubt that MISSION BAY JET SPORTS has satisfied the pleading

2  requirements of Supplemental Rule F. Not only has MISSION BAY JET SPORTS adequately

3  pled the requirements set forth in Supplemental Rule F, the Court, for purposes of the

4  Claimants' Motion to Dismiss, must consider these allegations as true. <u>Parks v. School of</u>

5  <u>Business, Inc. v. Symington</u>, 51 F.3d 1480, 1484 (9th Cir. 1995). Because MISSION BAY JET

6  SPORTS is the true owner of the subject Sea-Doo, and because the pleading requirements have

7  been met, the Court must deny the Claimants' Motion to Dismiss. As "the standard for leave

8  to amend is generous," and such leave must be "freely granted when justice so requires,"

9  MISSION BAY JET SPORTS respectfully requests that should the Court grant Claimants'

10  Motion to Dismiss, that MISSION BAY JET SPORTS be granted leave to amend to plead any

11  additional facts that this Court deems necessary to be in compliance with Supplemental Rule F.

12  <u>Balistreri</u>, *supra*, 701. However, MISSION BAY JET SPORTS contends that it has pled all

13  that is required by Supplemental Rule F.

14  **C.    The Limitation of Liability Applies to the Present Case.**

15    In their Motion to Dismiss, the Claimants assert that the Complaint must be dismissed

16  because the Limitation of Liability Act does not afford any relief to MISSION BAY JET

17  SPORTS. The Claimants seem to think that the mere allegation that the owner knew of some

18  condition that led to the accident defeats the Limitation of Liability. That is not the law. The

19  Limitation of Liability Act, at 46 U.S.C.A 30505(b), clearly states that:

20        Unless otherwise excluded by law, claims, debts, and liability
         subject to limitation under subsection (a) are those arising from any

21        embezzlement, loss, or destruction of any property, goods, or
         merchandise shipped or put on board the vessel, **any loss, damage**

22        **or injury by** collision, or **any act**, matter, or thing, loss, damage, or
         forfeiture, done, occasioned, or incurred, without the privity or

23        knowledge of the owner. (Emphasis added).

24    According to the Ninth Circuit Court of Appeals, once a limitation of liability petition

25  has been filed, such as in the present matter, the court "must *first* determine what acts of

26  negligence or conditions of unseaworthiness caused the accident." <u>In the Matter of the</u>

27  <u>Complaint of Hechinger</u>, 890 F.2d 202, 207 (9th Cir. 1989) (citing <u>Petition of M/V Sunshine, II</u>,

28  808 F.2d 762, 764 (11th Cir. 1987); and <u>Farrell Lines, Inc. v. Jones</u>, 530 F.2d 7, 10 (5th Cir.

12

1   1976)).  Liability must first be shown to exist.  Id.  In the present case, the Claimants have

2   alleged, among other things, that MISSION BAY JET SPORTS was negligent in training Kohl,

3   that MISSION BAY JET SPORTS negligently supervised Kohl, that MISSION BAY JET

4   SPORTS authorized misrepresentation by Kohl, and the subject Sea-Doo did not have proper

5   hand-holds or restraints.  (See, Claimants Motion to Dismiss, at p. 4).  These allegations

6   unquestionably fall within the applicable claims of the Limitation of Liability Act.

7        Clearly, the Court must first determine what, if anything, MISSION BAY JET SPORTS

8   did to cause the subject accident.  The Claimants have alleged far more than just "negligent

9   entrustment," and mere allegations, without proof, simply do not automatically lead to the

10  dismissal of the Complaint.  If it did, the Limitation of Liability Act would not be in existence.

11  Actually, Congress recently re-codified the Limitation of Liability Act in 2006, and made only

12  a few minor changes to the law.  (See, House Report 109-170, H.R.Rep. 109-170, p. 990-994,

13  July 14, 2005).  The Limitation of Liability Act is still the law, and it applies to the present

14  matter.

15       Claimants urge the Court to disregard the applicable law and hold that the Limitation of

16  Liability Act does not apply to this personal water craft accident.  Claimants do not cite to any

17  authority that the Limitation of Liability Act does not apply to personal water craft.  In fact,

18  Claimants cite to a case where the court applied the Act in a personal water craft case.

19  Specifically, the court in Keys Jet Ski, Inc. V. Kays, 893 F.2d 1225, 1229 (11th Cir. 1990) held

20  that the Limitation of Liability Act does apply to pleasure craft, such as a personal water craft.

21  In its holding, the Keys court stated that "**Congress's failure to limit the applicability of the**

22  **Act when additional amendments were made in 1935, 1936, and 1984, supports the**

23  **proposition that Congress intended the Act to apply to 'any vessel.'**" Id. at 1228.  Further,

24  Congress did not limit the applicability of the Limitation of Liability Act at the time the Act

25  was recently re-codified and modified.  (See, House Report 109-170, H.R.Rep. 109-170, p.

26  990-994, July 14, 2005).

27       Federal Circuit and District Courts throughout the country have routinely held that the

28  Limitation of Liability Act applies to pleasure craft, including personal water craft.  Keys Jet

1 | Ski, Inc., *supra*; In the Matter of the Complaint of Hechinger, 890 F.2d 202, 207 (9th Cir.

2 | 1989); Waggoner v. Nags Head Water Sports, Inc., 141 F.3d 1162 (4th Cir. 1998); Richards v.

3 | Blake Builders Supply, Inc., 528 F.2d 745, 749 (4th Cir. 1975); Hodges v. Summer Fun Rentals,

4 | Inc., 2006 WL 2927419 (9th Cir. 2006) (not selected for publication); In re Young, 872 F.2d

5 | 176 (6th Cir. 1989); Tassinari v. Key West Water Tours, L.C., slip copy, 2007 WL 1879172

6 | (S.D. Fla. 2007); In re Complaint of Royal Caribbean Ltd., 459 F.Supp.2d 1275 (S.D. Fla.

7 | 2006); Szollosy v. Hyatt Corp., 208 F.Supp.2d 205 (D. Conn. 2002); In re Waterfront License

8 | Corp., 2005 A.M.C. 2013 (S.D. Fla. 2005); In re Strahle, 250 F.Supp.2d 997 (N.D. Ind. 2003);

9 | Complaint of Beesley's Point Sea-Doo, Inc., 956 F.Supp. 538 (D.N.J. 1997); and many more.

10 | It should also be noted that the U.S. Supreme Court, in two separate cases, assumed

11 | without discussion that the Limitation of Liability Act applied to pleasure craft. (See, Coryell

12 | v. Phipps (The Seminole), 317 U.S. 406 (1943); and Just v. Chambers, 312 U.S. 383 (1941).

13 | The amount of cases involving the application of the Limitation of Liability Act to pleasure

14 | craft is far too large to present here. There is no doubt that the Limitation of Liability Act

15 | applies to pleasure craft, including the subject vessel. As noted by the court in the pleasure

16 | craft case of In re Young, *supra*, with regard to the applicability of the Limitation of Liability

17 | Act, "If anything is broken, it is up to Congress to fix it." In re Young, 872 F.2d 176, 178 (6th

18 | Cir. 1989). To date, Congress has done nothing to eliminate the applicability of the Act to

19 | personal water craft or other recreational vessels, despite the many opportunities to do so.

20 | 

### IV.

21 | 

### CONCLUSION

22 | The area in which the accident occurred is "navigable" as defined by maritime law. It is

23 | subject to the ebb and flow of the tide, it has the potential to (and does) support maritime

24 | commerce, and it is open to the Pacific Ocean. Furthermore, all waters of Mission Bay are

25 | statutorily regulated by the federal government as "navigable."

26 | According to the U.S. Supreme Court, a passenger injured aboard a pleasure boat on

27 | navigable waters places the alleged tort within admiralty jurisdiction. Foremost Ins. Co. v.

28 | Richardson, 457 U.S. 668, 676-677 (1982). As the alleged accident area, located within

14

Mission Bay, is "navigable," and because the passengers were injured as a result of the accident, there is admiralty jurisdiction. As more fully set forth above, passengers that have fallen off of a personal water craft and/or swimmers have the potential to disrupt maritime commerce. Furthermore, it is without question that the alleged negligent operation of a vessel, as implicated in the present matter, is a "traditional maritime activity."

It is abundantly clear that admiralty jurisdiction applies to this case. Pursuant to the foregoing, MISSION BAY JET SPORTS respectfully requests the Court to dismiss the Claimants' 12(b)(1) Motion to Dismiss for lack of admiralty jurisdiction.

Furthermore, MISSION BAY JET SPORTS respectfully requests that the Court dismiss the Claimants' Rule 12(b)(6) Motion to Dismiss. The Claimants must first prove that MISSION BAY JET SPORTS caused the subject accident. Only at that time does MISSION BAY JET SPORTS have to prove that it did not have "privity and knowledge." The Limitation of Liability Act applies to the allegations made by Claimants against MISSION BAY JET SPORTS. Further, it is well settled that personal water craft are subject to the Limitation of Liability Act, as a matter of law.

MISSION BAY JET SPORTS has fully complied with the pleading requirements of Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims. The Claimants' Motion to Dismiss is without merit, and should be dismissed in its entirety. However, should the Court grant the Claimants' motion, MISSION BAY JET SPORTS respectfully requests leave to amend the Complaint.

LAW OFFICES OF CHARLES S. LiMANDRI, APC

DATED: March 21, 2008          By:          /s/ Sterling J. Stires
                                            Sterling J. Stires, Esq., and
                                            Law Office of Rocky K. Copley
                                            Rocky K. Copley, Esq.
                                            Attorneys for Plaintiffs MISSION BAY JET
                                            SPORTS, LLC and ROBERT ADAMSON

15

**Exhibit A**



# UNITED STATES Coast Pilot® 7

## Pacific Coast: California, Oregon, Washington, Hawaii, and Pacific Islands

### 2008 (40th) Edition

This edition has been corrected through: 11th Coast Guard District Local Notice to Mariners No. 35/07, 13th Coast Guard District Local Notice to Mariners No. 36/07 and the 14th Coast Guard District Local Notice to Mariners No. 31/07.

Changes 1 through 30 to the previous edition (39th Edition, 2007) have been entered into this edition.

Changes to this edition will be published in the Eleventh Coast Guard District Local Notice to Mariners, the Thirteenth Coast Guard District Local Notice to Mariners, the Fourteenth Coast Guard District Local Notice to Mariners, and the National Geospatial-Intelligence Agency (NGA) Notice to Mariners. The changes are also on the internet at http://nauticalcharts.noaa.gov/nsd/cpdownload.htm.



### U.S. Department of Commerce
Carlos M. Gutierrez, Secretary

### National Oceanic and Atmospheric Administration (NOAA)
Vice Admiral Conrad C. Lautenbacher, Jr., USN (Ret), Under Secretary of
    Commerce for Oceans and Atmosphere, and Administrator, NOAA

### National Ocean Service
John H. Dunnigan, Assistant Administrator for Ocean Services
    and Coastal Zone Management

Washington, DC
For sale by the National Ocean Service and its sales agents

# Preface

The United States Coast Pilot is published by the National Ocean Service (NOS), National Oceanic and Atmospheric Administration (NOAA), pursuant to the Act of 6 August 1947 (33 U.S.C. 883a and b), and the Act of 22 October 1968 (44 U.S.C. 1310).

The Coast Pilot supplements the navigational information shown on the nautical charts. The sources for updating the Coast Pilot include but are not limited to field inspections conducted by NOAA, information published in Notices to Mariners, reports from NOAA Hydrographic vessels and field parties, information from other Government agencies, State and local governments, maritime and pilotage associations, port authorities, and mariners.

This volume of Coast Pilot 7, Pacific Coast, California, Oregon, Washington, and Hawaii, cancels the 39th Edition.

**Notice.–Amendments are issued to this publication through U.S. Coast Guard Local Notices to Mariners. A subscription to the Local Notice to Mariners is available upon application to the appropriate Coast Guard District Commander (Aids to Navigation Branch). Consult the appendix for addresses. All amendments are also issued in National Geospatial-Intelligence Agency Notices to Mariners. Mariners may also download and print amendments from the Internet at http://nauticalcharts.noaa.gov/nsd/cpdownload.htm.**

Mariners, and others, are urged to report errors, omissions, or differing conditions to those found in the Coast Pilot, or shown on the charts, in order that they may be fully investigated and corrections made. A Coast Pilot Report form is included in the back of this book and a Marine Information Report form is published in the National Geospatial-Intelligence Agency Notice to Mariners for your convenience. These reports, and/or suggestions for increasing the usefulness of the Coast Pilot, should be sent to:

Chief, Coast Pilot Branch (N/CS51)
Office of Coast Survey
National Ocean Service, NOAA
1315 East-West Highway
Silver Spring, MD 20910-3282.

# San Diego to Point Arguello, California

(1)     This chapter describes the 240-mile irregular coast of southern California from the Mexican border to Point Arguello. The coast extends in a general NW direction and includes the major ports of San Diego, Long Beach, Los Angeles, and Port Hueneme. This chapter also describes the recreational and fishing ports of Oceanside, Newport Beach, Ventura, Santa Barbara, and the many other recreational boating ports on San Pedro and Santa Monica Bays and along the Santa Barbara Channel.

**COLREGS Demarcation Lines**

(2)     The lines established for this part of the coast are described in **80.1104 through 80.1126**, chapter 2.

## Chart 18022

(3)     There are several islands and dangers from 7 to 100 miles off the southern California coast; they are described in chapter 5.

(4)     Many restricted and danger areas are in these waters. (See **334.860, 334.870, 334.880, and 334.890**, chapter 2 for limits and regulations.) In addition, missile firing, gunnery, and bombing operations are conducted on and over offshore waters not included in the areas defined in chapter 2, and at times endanger surface vessels. Information about these areas is published in Local Notice to Mariners issued by Commander, Eleventh Coast Guard District, Alameda, CA, and Notices to Mariners issued by National Geospatial-Intelligence Agency, Washington, D.C.

(5)     Vessels are requested not to tow submerged objects across charted submarine transit lanes in use off the coast of southern California.

**Weather, San Diego to Point Arguello**

(6)     The mild climate from San Diego to Point Arguello is controlled by the Pacific high-pressure system. Aided by the sea breeze, it brings winds from off the water, mainly S through N, which help keep coastal temperatures up in winter and down in summer. Coldest average temperatures range from the middle to upper fifties (12.8° to 15.0°C), while summertime readings are most often in the seventies (22° to 16°C). Occasionally a hot dry flow off the land in autumn will cause temperatures to soar into the nineties (33° to 38°C), and a rare winter outbreak from the E can drop temperatures to below freezing (<0°C). Winter is the rainy season, although not much rain falls along these coasts.

(7)     Strong winds and rough seas, while less frequent than farther N, can be a problem from the middle of fall through late spring. Strong pressure gradients, distant storms, and infrequent close storms account for most of the gales and seas of 12 feet (3.7 m) or more, particularly off Point Arguello and in the Santa Barbara Channel. Strong local winds (Santa Ana) also generate gales along sections of this coast.

(8)     Advection or sea fog, formed by warm moist air flowing over cool water, frequently confronts mariners in these waters. It is a persistent and widespread problem, particularly in the summer and fall N of Santa Monica, and in fall and winter S of Santa Monica.

## Charts 18740, 18765

(9)     In clear weather, vessels coming from S will sight Table Mountain, and its surrounding high land, and Los Coronados before picking up the San Diego landmarks.

(10)     **Table Mountain** (chart 18022), conspicuous and flat-topped, is in Mexican territory, 25 miles SE of Point Loma and 6 miles inland.

(11)     **Los Coronados (Coronado Islands)** are four bare, rocky islands, extending 4.5 miles in a NW direction, 7 miles offshore in Mexican waters, and 15 miles S of Point Loma. These islands are prominent in clear weather, and the passage E of them is commonly used by vessels. Depths in the vicinity of the islands are irregular, and in thick weather or at night caution must be observed when near them.

(12)     A light is shown from a white cylindrical masonry tower on the S end of the S island; it is obscured from certain directions by the N islands. Another light is

protected by breakwaters marked at the outer ends by private lights. The entrance channel and basin channel are marked by private buoys, lights, and daybeacons. In 2002, the approach to the basin had a reported depth of 18 feet with 16 feet reported alongside the piers. Berthing, electricity, water, ice, sewage pump-out, nautical supplies, and a launching ramp are available.

**Chart 18740**

(95) The 80-mile coast between San Diego Bay and San Pedro Bay is thickly settled, and the buildings of numerous towns and resorts are prominent from offshore. Several small-boat harbors and the port of Newport Bay are along the coast.

(96) The first 11 miles of the coast, between Point Loma and Point La Jolla, is extremely rocky, and the kelp beds extend up to 2 miles from shore; vessels should stay well offshore.

(97) About 1 mile N of Point Loma Light is a submerged sewer outfall line extending about 1 mile to the W.

(98) **Ocean Beach**, 5 miles N of Point Loma, has a large Y-shaped fishing pier with a private fog signal on the end.

**Weather, Gulf of Santa Catalina**

(99) Over the Gulf of Santa Catalina and along its shores, fog is a problem during fall and winter. This is most often a land (radiation) fog that drifts out over the gulf at night. By late morning, conditions begin to clear, particularly along the coast. Offshore, fog reduces visibilities to less than 0.5 mile (0.9 km) on about 4 to 9 days per month, from September through February and in May. September and October are the worst months. Along the coast, visibilities drop below 0.5 mile (0.9 km) on about 2 to 8 days per month from August through April. November, December, and February are the worst months.

(100) Gale force winds never occur as much as 1 percent of the time in the Gulf of Santa Catalina. They are infrequently encountered from November through April. Wind speeds of 17 knots or more occur about 1 to 3 percent of the time from December through May. Winds on the coast are often light. At Camp Pendleton, winds less than 3 knots occur 40 to 50 percent of the time from September through March. Seas are most likely to get choppy from November through April, when distant storms S of 40°N. generate W swells. These swells are 6 feet (1.8 m) or more, about 2 to 5 percent of the time. In winter, they occasionally exceed 9 feet (2.7 m) and some 12-foot (3.7 m) swells have been reported.

**Chart 18765** 

(101) **Mission Bay**, entered between two jetties 5.5 miles N of Point Loma, is a recreational small-craft harbor administered by the city of San Diego. A light and a fog signal are at the outer end of the N jetty. A prominent feature when approaching the harbor is the municipal fishing pier at Ocean Beach, 0.3 mile S of the entrance. The lighted 338-foot tower at Sea World is prominent 1.8 miles E of the entrance. Fog signals are sounded from the fishing pier. A dredged channel leads from deep water in the Pacific Ocean to the highway bridge about 1.3 miles above the entrance. **Quivira Basin** and **Mariners Basin**, on the E and W sides of the channel, respectively, are entered about 1 mile above the entrance.

(102) In August 2006, the controlling depth was 13 feet in the dredged channel to the highway bridge (except for lesser depths to 8 feet along the edges of the channel); general depths of 14 to 15 feet were available in Mariners Basin with lesser depths along the edges and a depth of 20 feet was available in Quivira Basin. A jetty marked on its outer end by a light, extends about 125 yards NW from the S side of the entrance to Quivira Basin. The inner bay has depths of about 6 feet.

(103) The entrance to Mission Bay can be difficult to navigate while surf is high. Large swells in any season and from virtually any direction can break completely across the entrance channel. With a rough sea outside, a heavy surge exists inside the bay, especially in Quivira Basin. Boats must be securely moored to prevent damage from this surge condition.

**No-Discharge Zone**

(104) The State of California, with the approval of the Environmental Protection Agency, has established a No-Discharge Zone (NDZ) in Mission Bay. It encompasses the entire by (see NOAA chart 18765 for the zone limits).

(105) Within the NDZ, discharge of sewage, whether treated or untreated, from all vessels is prohibited. Outside the NDZ, discharge of sewage is regulated by **40 CFR 140** (see Chapter 2).

**COLREGS Demarcation Lines**

(106) The lines established for Mission Bay are described in **80.1106**, chapter 2.

(107) Two fixed highway bridges cross Mission Bay. The first, crossing above the entrance between Ventura Point and Sunset Point, has a clearance of 38 feet. The second, connecting Vacation Isle with Crown Point to the N and Dana Landing to the S, has a clearance of 31 feet under the N span and 38 feet under the S span.

# CERTIFICATE OF SERVICE

## In the Matter of the Complaint of Mission Bay Jet Sports, LLC

*U.S. District Court Case No.:  08 CV 0146 JM (CAB)*

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; my business address is P.O. Box 9120, Rancho Santa Fe, California 92067, and that I served the following document(s):

- **LIMITATION PETITIONERS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO HALEY COLOMBO AND JESSICA SLAGEL'S MOTION TO DISMISS COMPLAINT; and**

- **DECLARATION OF ROY "BUCK" EVERINGHAM IN SUPPORT OF LIMITATION PETITIONERS' OPPOSITION TO MOTION TO DISMISS.**

on the interested parties in this action by placing a true copy in a sealed envelope, addressed as follows:

Thomas Tosdal, Esq.
TOSDAL SMITH STEINER & WAX
401 West "A" Street, Ste. 320
San Diego, CA 92101
Tel:  (619) 239-7200
Fax:  (619) 239-6048
E-Mail: ttosdal@tosdalsmith.com
**Attorneys for Plaintiffs**

Rocky K. Copley, Esq.
LAW OFFICES OF ROCKY COPLEY
550 West "C" Street, Ste. 1150
San Diego, CA  92101
Tel:  (619) 232-3131
Fax:  (619) 232-1690
E-Mail: rkcopley@rkc-rocklaw.com
**Attorneys for Mission Bay Jet Sports, LLC and Robert Adamson**

■    **BY MAIL - as follows:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Rancho Santa Fe, California in the ordinary course of business. The envelope was sealed and placed for collection and mailing on this date following our ordinary practices. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

■    **BY ELECTRONIC MAIL - as follows:** I served a true copy, electronically on designated recipients via electronic transmission of said documents.

I declare under penalty of perjury, under the laws of the State of California, that the above is true and correct.

Executed on March 21, 2008, at Rancho Santa Fe, California.

Kathy Denworth

1