1  Rocky K. Copley, SBN 101628
   LAW OFFICE OF ROCKY K. COPLEY
2  550 West "C" Street, Ste. 1150
   San Diego, CA 92101
3  Tel: (619) 232-3131; Fax: (619) 232-1690

4  Charles S. LiMandri, SBN 110841
   Sterling J. Stires, SBN 199218
5  LAW OFFICES OF CHARLES S. LiMANDRI, APC
   P.O. Box 9120
6  Rancho Santa Fe, California 92067
   Tel: (858) 759-9930; Fax: (858) 759-9938

7
   Attorneys for Movants MISSION BAY JET SPORTS, LLC
8  and ROBERT ADAMSON

9

10              UNITED STATE DISTRICT COURT

11            SOUTHERN DISTRICT OF CALIFORNIA

12  IN THE MATTER OF THE COMPLAINT )   CASE NO. 08cv0146 JM (CAB)
    OF MISSION BAY JET SPORTS, LLC; )
13  ROBERT ADAMSON, individually and )  **LIMITATION PETITIONERS'**
    d.b.a. MISSION BAY JET SPORTS, FOR )  **SUPPLEMENTAL  MEMORANDUM OF**
14  EXONERATION FROM OR            )   **POINTS AND AUTHORITIES IN**
    LIMITATION OF LIABILITY,       )   **OPPOSITION TO HALEY COLOMBO**
15                                 )   **AND JESSICA SLAGEL'S MOTION TO**
                                   )   **DISMISS COMPLAINT**
16                                 )
              Limitation Petitioners. )   Date:       April 18, 2008
17                                 )   Time:       1:30 p.m.
                                   )   Dept.:      16
18                                 )   Magistrate: Hon. Cathy Ann Bencivengo
                                   )   Judge:      Hon. Jeffrey T. Miller
19  _____ )

20         Pursuant to the request of this Court, Limitation Petitioners, MISSION BAY JET SPORTS,

21  LLC and ROBERT ADAMSON, individually and doing business as MISSION BAY JET SPORTS

22  (hereinafter collectively referred to as "MISSION BAY JET SPORTS"), hereby submit the

23  following Supplemental Memorandum of Points and Authorities in Opposition to Haley Colombo

24  and Jessica Slagel's Motion to Dismiss.  Pursuant to the request of the Court, this brief addresses

25  the issues regarding the "first prong" of the so-called "connection test" for admiralty jurisdiction

26  as addressed in the U.S. Supreme Court cases of Sisson v. Ruby, 497 U.S. 358 (1990) and Jerome

27  B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527 (1995).

28  ///

                                    1

# I.

## THE CONNECTION TEST FOR ADMIRALTY JURISDICTION.

As the Court indicated in its Order Requesting Further Briefing, the subject incident must have the potential to disrupt commercial marine commerce for admiralty jurisdiction to apply to the present matter. Sisson v. Ruby, 497 U.S. 358, 363 (1990); and Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 531 (1995). For reasons stated herein, MISSION BAY JET SPORTS asserts that the subject accident certainly had the potential of disrupting maritime commerce.

According to the Supreme Court in Sisson, the Court must:

> . . .determine the potential impact of a given type of incident by examining its general character. The jurisdictional inquiry does not turn on the *actual* effects on maritime commerce of the [accident]; nor does it turn on the particular facts of the incident in this case. . . **Rather, a court must assess the general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial maritime activity.**

Sisson, *supra*, 497 U.S. at 363 (emphasis added). The Court in Grubart held that, although there are cases that hold that not "every tort involving a vessel on navigable waters falls within the scope of admiralty jurisdiction no matter what, they do show that ordinarily that will be so." Grubart, *supra*, 513 U.S. at 543.

As the Court noted in its Order Requesting Further Briefing, the interest giving rise to admiralty jurisdiction is the protection of maritime commerce. Foremost Ins. Co. v. Richardson, 457 U.S. 668, 674-675. However, the U.S. Supreme Court held, in Foremost, that:

> The federal interest in protecting maritime commerce cannot be adequately served if admiralty jurisdiction is restricted to those individuals actually *engaged* in commercial maritime activity. **This interest can be fully vindicated only if *all* operators of vessels on navigable waters are subject to uniform rules of conduct.** The failure to recognize the breadth of this federal interest ignores the potential effect of noncommercial maritime activity on maritime commerce.

Id. Clearly, the connection test does not require that the activity involved be commercial in nature. Id.

/ / /

SUPPLEMENTAL P's & A's IN OPPOSITION TO MOTION TO DISMISS COMPLAINT
CASE NO.: 08cv0146 JM (CAB)

1   In Foremost, the Court found admiralty jurisdiction after examining the general features of

2   the accident involved in that case. The U.S. Supreme Court in Foremost held that even though the

3   two pleasure craft involved in the collision did not impede any commercial ships where the

4   accident occurred, there existed the potential for interrupting maritime commerce. Foremost, supra,

5   457 U.S. at 675. This is because had the vessels collided at the mouth of the heavily traveled St.

6   Lawrence Seaway, far from where the accident actually occurred, the incident would likely have

7   impeded maritime commerce. Id. (See, Sisson, supra, 497 U.S. at p. 363-364 for summary).

8   Another case, in interpreting both Foremost and Sisson, held that:

9       To determine the "potential effect on maritime commerce," we must
        imagine a incident of the same *general character* as the incident under
10      consideration as having occurred, not in the location in which it
        actually occurred, but in the *busiest conceivable sea lane*. From that
11      premise, we must then postulate the possible effect on commercial
        shipping of the occurrence *in that latter location*.
12

13  Choat v. Kawasaki Motors Corp., 675 So.2d 879, 880-881 (1996)(emphasis in original), citing

14  Sisson, supra, 497 U.S. at 363, and Price v. Price, 929 F.2d 131, 135 (4th Cir. 1991). Further, in

15  the fairly recent case of Walton v. Channel Star Excursions, Inc., 2007 WL 763299 (E.D. Cal.

16  2007)(only Westlaw citation is currently available), the court held that it must "evaluate the actions

17  of the alleged torfeasor, not the injured party, in order to properly assess the potential for disruption

18  of maritime commerce." Id. (See also, Taghadomi v. Unites States of America, 401 F.3d 1080,

19  1087, which notes that the court in Grubart wrote approvingly of the notion that "virtually every

20  activity involving a vessel on navigable waters would be a traditional maritime activity sufficient

21  to invoke maritime jurisdiction." Grubart, supra, 513 U.S. at 542).

## II.

### THE SUBJECT ACCIDENT HAD THE POTENTIAL TO DISRUPT MARITIME COMMERCE.

25  The subject accident occurred in what is designated as the South Pacific Passage Personal

26  Watercraft Area in Mission Bay, San Diego (hereinafter referred to as the "PWC area"). (See, San

27  Diego Police/Harbor Unit Vessel Accident Report for the subject accident, attached hereto as

28  Exhibit "A"). The accident investigator for the San Diego Police/Harbor Unit was Rene Oliver,

1    and her deposition was taken in the California State Court case against the operator of the PWC,

2    Brett Kohl, on February 26, 2008. Excerpts of Officer Oliver's deposition, along with the exhibits

3    to that deposition, are attached hereto as Exhibit "B".[1] According to Officer Oliver, the PWC area

4    is only open to personal watercraft ("PWC") vessels, and there is a buoy line strung across the

5    South Pacific Passage to indicate the PWC area. (Ex. "B," at p. 7, l. 20 to p. 9, l. 24; and p. 11, l.

6    12 to p. 12, l. 23).

7         When Office Oliver received the reporting of the accident, she was patrolling Mission Bay

8    on a San Diego Police/Harbor Unit (the "Harbor Unit") motor boat, and traveled to the accident

9    scene via the Harbor Unit vessel. (Ex. "B," at p. 46, ll. 12 - 21). According to Officer Oliver,

10   when she arrived at the scene, she observed Ms. Colombo and Ms. Slagel being treated by the

11   lifeguards, and she conducted on scene interviews of the witnesses, which are recorded in the

12   accident report. (Ex. "B," at p. 13, l. 8 to p. 16, l. 3). Officer Oliver testified that the investigation

13   of the subject accident and the generation of the accident report took her approximately two (2)

14   to three (3) working days, ten hours per day. (Ex. "B," at p. 56, ll. 12 - 21).

15        In the accident report, Officer Oliver indicated that the operator of the subject PWC, Brett

16   Kohl, was driving the PWC with both Ms. Colombo and Ms. Slagel aboard as passengers. (Ex.

17   "A," at p. 4 "Synopsis"). The accident report further states that "Kohl maneuvered the vessel in

18   a manner that caused Colombo and Slagel to fall overboard. This caused serious injury to both."

19   Id. However, in the "Conclusion" portion of the accident report, at page 7, Officer Oliver stated

20   that:

21        Kohl intentionally threw Colombo and Slagel overboard. Neither
         passenger wanted to get back aboard with Kohl. Kohl promised not
22        to throw them overboard, again. Colombo and Slagel got back on the
         personal watercraft. Kohl intentionally threw them overboard, a
23        second time, causing their injuries. Kohl was negligent and showed
         extreme indifference to the physical and psychological well being of
24        the passengers on board. Kohl demonstrated this by repeating the
         maneuver when told not to do so.
25   ///

26

27   _____

28        [1]For exhibit identification purposes, the testimony identifying and describing the photographic exhibits
     are included in the attached excerpts, that may or may not be otherwise cited to herein.

SUPPLEMENTAL P's & A's IN OPPOSITION TO MOTION TO DISMISS COMPLAINT
CASE NO.: 08cv0146 JM (CAB)

1    According to Officer Oliver, the accident occurred because Brett Kohl intentionally "threw"

2  Ms. Colombo and Ms. Slagel off of the PWC by operating the PWC in an erratic manner and at

3  an unsafe speed. (Ex. "B," at p. 26, l. 15 to p. 27, l. 5; p. 31, l. 6 to p. 35, l. 5; p. 39, ll. 5 - 17; p.

4  72, l. 23 to p. 73, l. 11; p. 75, l. 2 to p. 76, l. 2; and p. 83, l. 10 to p. 85, l. 12). The "general

5  features," as referred to in Sisson and its progeny, of the type of incident alleged in this matter are

6  that a PWC is being operated at an unsafe speed and erratically. The "general features" include

7  passengers being repeatedly and intentionally thrown into the water by the operator of the vessel

8  with a disregard to the safety of the passengers, which caused severe injuries to the passengers.

9  Furthermore, law enforcement and Lifeguard personnel were summoned to the scene, and a

10  criminal investigation was instigated. There can be absolutely no doubt that such conduct and

11  activity has the potential for disrupting maritime commerce.

12    The fact that the subject accident occurred in an area where there is no "commercial

13  shipping" is of no consequence. Had this accident occurred in a busy shipping lane, the potential

14  for the disruption of maritime commerce would be obvious. (See, Foremost, supra, 457 U.S. at

15  67). An accident with the "general features" as described, could easily close down a shipping lane,

16  divert commercial vessel traffic, and create general chaos on the water. MISSION BAY JET

17  SPORTS contends that maritime commerce actually has been disrupted by the subject accident,

18  and that accidents with these "general features" certainly have the potential to disrupt maritime

19  commerce. MISSION BAY JET SPORTS further contends that maritime commerce takes place

20  within the PWC area on a daily basis because the commercially rented PWCs operate in the

21  designated PWC area.

22    As part of the criminal investigation into the subject accident, the San Diego District

23  Attorney's office, through the San Diego Police Harbor Unit, impounded the subject PWC. (Ex.

24  "B," at 42, ll. 9 - 11; and Declaration of Robert Adamson ("Adamson Decl."), concurrently filed

25  herewith, at para. 15). The PWC has not been returned to MISSION BAY JET SPORTS, which

26  has not been able to rent out the subject PWC as a direct result of the subject accident. (Adamson

27  Decl. at para. 15). As the subject PWC continues to be unavailable for MISSION BAY JET

28  SPORTS to rent out to the public at the present time, and will not be available until it is released

5

1  by the Harbor Unit, there has been, and will continue to be, a significant negative economic impact
2  on MISSION BAY JET SPORTS' commercial PWC rental business because it will have fewer
3  business opportunities with the PWC out of service. (Adamson Decl. at para. 15).

4  　　　As noted above, Officer Oliver spent two to three full days investigating this accident and
5  preparing her report. The "general feature" of this accident of keeping a Harbor Unit officer
6  occupied for two to three days investigating an accident, rather than patrolling the waters of
7  Mission Bay, certainly has the potential of disrupting maritime commerce. This is because the
8  potential exists that the officer's absence on the water, or otherwise engaged in her normal duties,
9  could keep her from the enforcement of laws and regulations relating to maritime commerce. This
10  is more than a mere possibility.

11  　　　Prior to the subject accident, there have been other PWC accidents in the PWC area which
12  have led to the temporary closure of the PWC area by the San Diego City Lifeguard and/or by the
13  Harbor Patrol. (Adamson Decl. at para. 9). Mr. Adamson has personally been present when the
14  PWC area had been closed to PWC traffic by the Lifeguard and/or Harbor Patrol because of PWC
15  accidents in the area. (Adamson Decl. at para. 9). During the times that the PWC area has been
16  closed, MISSION BAY JET SPORTS had to inform its customers that they could not operate
17  commercially rented PWCs in the preferred PWC area. (Adamson Decl. at para. 10). Because
18  potential customers of MISSION BAY JET SPORTS could not operate the commercially rented
19  PWCs in the PWC area when the area was closed due to an accident, the potential customers have
20  decided not to rent the PWCs during that time. Therefore, PWC accidents, such as the subject
21  accident, can, and do, lead to the closure of the PWC area, which interrupts the business of
22  commercially renting PWCs to the public by MISSION BAY JET SPORTS and the other local
23  commercial PWC rental businesses. (Adamson Decl. at para. 13). Furthermore, if the PWC area
24  was to be closed for a prolonged period, MISSION BAY JET SPORTS, and the rest of the
25  commercial PWC rental businesses, would be significantly impacted in a negative way. This is
26  because the commercially rented PWCs owned by MBJS, and those PWCs rented out by the other
27  commercial PWC rental companies on or around Mission Bay, are operated within the preferred
28  PWC area. (Adamson Decl. at para. 14).

SUPPLEMENTAL P's & A's IN OPPOSITION TO MOTION TO DISMISS COMPLAINT
CASE NO.: 08cv0146 JM (CAB)

1       Officer Oliver traveled to the accident scene on a Harbor Unit vessel. (Ex. "B," at p. 46,

2 ll. 12 - 21). When there is an accident where the Harbor Unit and/or Lifeguards are summoned,

3 and they travel to the accident scene by way of a boat, the Harbor Unit and/or Lifeguard display

4 a flashing blue light, much like the lights on a police patrol car. (Adamson Decl. at para. 9; and

5 California Harbors and Navigation Code § 652.5). The presence of a law enforcement vessel

6 traveling to and arriving at the accident scene is another "general feature" of the subject accident.

7 According to California Harbors and Navigation Code Section 652.5(a), the use of the flashing

8 blue light is reserved for law enforcement vessels, and is displayed whenever the vessel may be

9 engaged in direct law enforcement activities. Section 652.5(d) states, in pertinent part, the

10 following:

11            Any vessel approaching, overtaking, being approached, or being

overtaken by a moving law enforcement vessel operating with a siren

12            or an illuminated blue light, or any vessel approaching a stationary

law enforcement vessel displaying an illuminated blue light, shall

13            immediately slow to a speed sufficient to maintain steerage only, shall

alter its course, within its ability, so as not to inhibit or interfere with

14            the operation of the law enforcement vessel, and shall proceed, unless

otherwise directed by the operator of the law enforcement vessel, at

15            the reduced speed until beyond the area of operation of the law

enforcement vessel.

16

17 Given that all vessels must alter their course and slow their speed when a law enforcement vessel

18 is in the area, and displaying a blue illuminated light and/or operating a siren, the presence of the

19 law enforcement vessel has the potential to disrupt maritime commerce. Indeed, such law

20 enforcement presence has disrupted maritime commerce in Mission Bay when the closure of the

21 PWC area has occurred, because commercially rented PWCs could not operate in the area when

22 law enforcement closed the PWC area.

23       In the case of Taghadomi v. Unites States of America, 401 F.3d 1080 (9th Cir. 2005), the

24 court found that admiralty jurisdiction existed because Coast Guard search-and-rescue operations

25 bear a substantial relationship to traditional maritime activity. Though search-and-rescue by law

26 enforcement was not required in the present matter, the potential for such activity existed given

27 the "general features" of the subject accident. Even the presence of a law enforcement vessel

28 traveling to the accident scene, displaying an illuminated blue light and/or operating a siren, would

1  certainly have the potential to disrupt maritime commerce as all vessels must slow down and

2  change their course in order to allow the law enforcement vessel to operate and conduct its duties

3  safely, and to avoid an accident scene.

4      **The mere fact that passengers were overboard in an emergency situation, such as the**

5  **present matter, by itself has the potential to disrupt maritime commerce.** Taghadomi, *supra*,

6  401 F.3d at 1086 (citing Polly v. Estate of Carlson, 859 F.Supp.270, 272 (E.D. Mich. 1994).  In

7  Polly v. Estate of Carlson, *supra*, the court applied the Sisson two pronged inquiry, and stated that:

8  ". . .this inquiry does not require courts to determine whether the incident actually disrupted

9  commercial activity; instead, the first prong is met if the incident had the *potential* to disrupt." Id.

10  at 272.  The court held that passengers overboard in an emergency situation have the potential to

11  disrupt maritime commerce.  Id.  In so holding, the court cited to Delta County Ventures v.

12  Magana, 986 F.2d 1260, 1262 (9th Cir. 1993), partially overruled on other grounds (diving accident

13  on navigable waters meets first prong of Sisson test because it was likely to require emergency

14  rescue operations); and Sinclair v. Soniform, Inc., 935 F.2d 599, 602 (crew's failure to treat scuba

15  diver suffering from the bends meets first prong of the Sisson test because of the 'possibility that

16  commercial vessels would be diverted to respond to a distress signal').  As there were passengers

17  in the water in an emergency situation in the present matter, the potential to disrupt maritime

18  commerce existed, and admiralty jurisdiction is proper in this case.

19  **III.**

20  **CONCLUSION**

21      As the court reflected in the Taghadomi case, one could quibble about precisely how to

22  frame the question as to whether the "general features" of the subject accident had the potential

23  to disrupt or impact maritime commerce, "but it is clear that at any reasonable level of generality,

24  the incident had a potentially disruptive impact on maritime commerce." Taghadomi, *supra*, 401

25  F.3d at 1086.  When considering the "general features" of the subject accident, the only reasonable

26  conclusion is that the subject accident had the potential to disrupt maritime commerce.  These

27  "general features" include an individual operating a PWC vessel at an unsafely high rate of speed,

28  turning sharply and erratically, who was intentionally "throwing" passengers in the water.  As a

8

result, the passengers were injured while in the water, and their injuries necessitated emergency care by the San Diego Lifeguard and the San Diego Police/Harbor Unit.  As noted in the <u>Polly</u> case, "the first prong of the <u>Sisson</u> test is easily met here" because there were passengers in the water in an emergency situation.  <u>Polly</u>, *supra*, 859 F.Supp. at 272.

Cases of this nature have necessitated the closure of the designated PWC area in Mission Bay, which has impacted the businesses that are engaged in commercially renting out PWCs to the public.  Furthermore, there was more than a mere possibility that maritime commerce could potentially be disrupted; maritime commerce actually has been disrupted as a result of the accident.  The subject PWC vessel was impounded by law enforcement officials, and is still unavailable for MISSION BAY JET SPORTS to rent out to the public.  Furthermore, the investigation into the accident prevented the investigating officer from performing her routine law enforcement duties on the waters of Mission Bay for at least 2 to 3 days.

For the foregoing reasons, MISSION BAY JET SPORTS respectfully submits that, under the first prong of the <u>Sisson</u> test, the subject accident had the potential to disrupt maritime commerce.  Therefore, a finding of admiralty jurisdiction in this case is just and proper.

LAW OFFICES OF CHARLES S. LiMANDRI, APC

DATED: May 8, 2008            By:      /s/ Sterling J. Stires
                                       Sterling J. Stires, Esq., and
                                       Law Office of Rocky K. Copley
                                       Rocky K. Copley, Esq.
                                       Attorneys for Plaintiffs MISSION BAY JET SPORTS,
                                       LLC and ROBERT ADAMSON

SUPPLEMENTAL P's & A's IN OPPOSITION TO MOTION TO DISMISS COMPLAINT
CASE NO.: 08cv0146 JM (CAB)

**Exhibit A**

08-17-2007 RCVD

# VESSEL ACCIDENT REPORT

CALIFORNIA DEPARTMENT OF BOATING & WATERWAYS

Page 1 OF 8

| AGENCY NAME TAKING REPORT | NO. INJURED | NO. KILLED | AGENCY REPORT NUMBER |
|---|---|---|---|
| San Diego Police/Harbor Unit | 2 | 0 | |

**LOCATION**

| WATERBODY ACCIDENT OCCURRED ON | | | MONTH | DAY | YEAR | TIME (2400) |
|---|---|---|---|---|---|---|
| Mission Bay | | | 7 | 29 | 2007 | 1845 |

| COUNTY ACCIDENT OCCURRED IN | NEAREST LANDMARK (NAVIGATION AID) | INVESTIGATED BY | PHONE (619) 221-8985 |
|---|---|---|---|
| San Diego | South Pacific Passage Personal Watercraft Area | Oliver | |

**OPERATOR / INVOLVED VESSEL**

| NAME (FIRST, MIDDLE, LAST) | | STREET / MAILING ADDRESS | | | |
|---|---|---|---|---|---|
| Brett Charles Kohl | | 2746 Luna Avenue | | | |

| IDENTIFICATION | DOB / AGE | SEX | CITY | STATE | ZIP | PHONE (619) |
|---|---|---|---|---|---|---|
| D5333031 | 7/23/1986  21 | ☒ MALE ☐ FEMALE | San Diego, CA | | 92117 | 822-9584 |

| VESSEL YEAR | MAKE / MODEL / LENGTH | VESSEL NUMBER (CF OR DOC) | VESSEL NAME | ACTIVITY |
|---|---|---|---|---|
| 2007 | Bomb/SeaDoo GTI/10'6" | 8326RM | | ☐ RECREATIONAL ☐ WORKBOAT ☐ COMMERCIAL ☒ RENTAL |

| HULL IDENTIFICATION NUMBER ☐ NONE | HORSEPOWER | RENTED | OWNER'S NAME ☐ SAME | PHONE (619) |
|---|---|---|---|---|
| YDV09441C707 | 130 hp | ☒ YES ☐ NO | Robert Adamson | 220-0334 |

| DIRECTION OF TRAVEL | # PERSONS ON BOARD | VESSEL DAMAGE | OWNER'S STREET / MAILING ADDRESS | ☐ SAME |
|---|---|---|---|---|
| Counter Clockwise Circles | 3 | ☐ MINOR ☒ MODERATE ☐ MAJOR ☐ TOTAL | Mission Bay Jet Sports 5370 Napa Street | |

| ESTIMATED SPEED | DISPOSITION OF VESSEL | ESTIMATED DAMAGE $ ☒ NONE | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| 25-35 mph | Operator | | San Diego, CA  92110 | | |

**OPERATOR / INVOLVED VESSEL / OTHER**

| NAME (FIRST, MIDDLE, LAST) | | STREET / MAILING ADDRESS | | | |
|---|---|---|---|---|---|
| | | | | | |

| IDENTIFICATION | DOB / AGE | SEX | CITY | STATE | ZIP | PHONE ( ) |
|---|---|---|---|---|---|---|
| | | ☐ MALE ☐ FEMALE | | | | |

| VESSEL YEAR | MAKE / MODEL / LENGTH | VESSEL NUMBER (CF OR DOC) | VESSEL NAME | ACTIVITY |
|---|---|---|---|---|
| | | | | ☐ RECREATIONAL ☐ WORKBOAT ☐ COMMERCIAL ☐ RENTAL |

| HULL IDENTIFICATION NUMBER ☐ NONE | HORSEPOWER | RENTED | OWNER'S NAME ☐ SAME | PHONE ( ) |
|---|---|---|---|---|
| | | ☐ YES ☐ NO | | |

| DIRECTION OF TRAVEL | # PERSONS ON BOARD | VESSEL DAMAGE | OWNER'S STREET / MAILING ADDRESS | ☐ SAME |
|---|---|---|---|---|
| | | ☐ MINOR ☐ MODERATE ☐ MAJOR ☐ TOTAL | | |

| ESTIMATED SPEED | DISPOSITION OF VESSEL | ESTIMATED DAMAGE $ ☐ NONE | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| | | | | | |

**OTHER PROPERTY**

| DESCRIPTION OF DAMAGE | ESTIMATED DAMAGE $ ☐ NONE |
|---|---|

| OWNER'S NAME | ADDRESS | STATE | ZIP | PHONE ( ) | NOTIFIED ☐ YES ☐ NO |
|---|---|---|---|---|---|

**VICTIMS / WITNESSES**

| VICTIM / WITNESS NAME, ADDRESS & PHONE | VICTIM / WITNESS STATUS | RIDING IN VESSEL # | DOB / AGE | INJURY DESCRIPTION | LIFE JACKET WORN? | COULD VICTIM SWIM? |
|---|---|---|---|---|---|---|
| Haley Coleen Colombo 1162 La Rosa Road, Arcadia, CA 91007 (626)254-9959 | ☒ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☐ WITNESS ONLY | P1 | 2/6/1991  16 | Torn Rectum requiring surgery. TAKEN TO HOSPITAL ☒ YES ☐ NO  FACILITY UCSD/Dr. Lee | ☒ YES ☐ NO ☐ UNKNOWN | ☒ YES ☐ NO ☐ UNKNOWN |
| Jessica Lynn Slagel 602 Fairview Avenue #5, Arcadia, CA 91007 (626)294-2994 | ☒ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☐ WITNESS ONLY | P1 | 1/19/1990  17 | Torn Vagina to Rectum requiring surgery. TAKEN TO HOSPITAL ☒ YES ☐ NO  FACILITY UCSD/Dr. Kingston | ☒ YES ☐ NO ☐ UNKNOWN | ☒ YES ☐ NO ☐ UNKNOWN |

SKETCH (INCLUDE VESSEL, WIND, CURRENT DIRECTION)
NOT TO SCALE

FIESTA ISLAND

INDICATE TRUE NORTH

SOUTH PACIFIC PASSAGE PWC AREA

P1

SOUTH SHORES

MISCELLANEOUS
N 32o 46.094
W 117o 12.634

| COPY OF STATE FORM A-1 GIVEN TO OPERATOR(S) | ☐ OPERATOR 1  ☐ OPERATOR 2 |
|---|---|

☐ COAST GUARD

☒ CALIFORNIA BOATING AND WATERWAYS
2000 EVERGREEN STREET, SUITE 100
SACRAMENTO CA 95815-3888

☐ CORONER    ☒ MARINE UNIT

☐ OTHER:

DBW FORM VAR-1 NAPA SHERIFF VERSION (06/03)

Exhibit 1
R. Oliver, 2/26/08

# VESSEL ACCIDENT REPORT

CALIFORNIA DEPARTMENT OF BOATING WATERWAYS    PAGE 2 OF 8

| WEATHER | WATER CONDITIONS | WAVE SIZE | WIND | LIGHTING | VISIBILITY |
|---|---|---|---|---|---|
| ☒ CLEAR | ☐ CALM | ☐ LESS THAN 6" | ☐ NONE | ☐ DAYLIGHT | ☒ GOOD  ☐ FAIR  ☐ POOR |
| ☐ CLOUDY | ☐ CHOPPY | ☐ 6" – 2' | ☐ LIGHT (0 – 6 mph) | ☐ DARK | |
| ☐ FOG | ☐ ROUGH | ☐ 2' – 6' | ☐ MODERATE (7 – 14 mph) | ☐ DUSK OR DAWN | **TEMPERATURE** |
| ☐ RAIN | ☐ VERY ROUGH | ☐ > 6' | ☐ STRONG (15 – 25 mph) | ☐ ARTIFICIAL LIGHT | WATER 72  AIR 66 |
| ☐ SNOW | | | ☐ STORM ( 25 mph & over) | ☐ OTHER (specify) | |
| ☐ HAZY | | | | | |

## TYPE OF ACCIDENT / CAUSE OF ACCIDENT / OPERATION AT TIME OF ACCIDENT / SOBRIETY OF OPERATOR

| TYPE OF ACCIDENT | CAUSE OF ACCIDENT | #1 #2 | OPERATION AT TIME OF ACCIDENT | #1 #2 | SOBRIETY OF OPERATOR / DRUG USE |
|---|---|---|---|---|---|
| ☐ CAPSIZING | ☐☐ IMPROPER LOOKOUT / INATTENTION | ☐☐ | CRUISING | ☐☐ | HAD NOT BEEN DRINKING |
| ☐ COLLISION WITH VESSEL | ☐☐ OPERATOR INEXPERIENCE | ☒☐ | CHANGING DIRECTION | ☐☐ | HBD NOT UNDER INFLUENCE |
| ☒ COLLISION WITH FIXED OBJECT | ☒☐ EXCESSIVE SPEED | ☐☐ | CHANGING SPEED | ☐☐ | HBD UNDER INFLUENCE |
| ☐ COLLISION WITH FLOATING OBJECT | ☐☐ MACHINERY FAILURE | ☐☐ | TOWING SKIER / TUBER | ☐☐ | HBD IMPAIRMENT UNKNOWN |
| ☒ FALL OVERBOARD | ☐☐ EQUIPMENT FAILURE | ☐☐ | TOWING SKIER - SKIER DOWN | ☐☐ | UNDER DRUG INFLUENCE |
| ☐ FALL IN BOAT | ☐☐ OFF-THROTTLE STEERING INABILITY | ☐☐ | TOWING ANOTHER VESSEL | ☐☐ | OTHER PHYSICAL IMPAIRMENT |
| ☐ FIRE / EXPLOSION (fuel) | ☐☐ IMPROPER LOADING | ☐☐ | BEING TOWED BY ANOTHER VESSEL | ☐☐ | IMPAIRMENT UNKNOWN |
| ☐ FIRE / EXPLOSION (other than fuel) | ☐☐ OVERLOADING | ☐☐ | DRIFTING | ☐☐ | NO OPERATOR |
| ☐ FLOODING / SWAMPING | ☐☐ HAZARDOUS WEATHER / WATER | ☐☐ | AT ANCHOR | | **OPERATOR EDUCATION** |
| ☐ GROUNDING | ☐☐ RESTRICTED VISION | ☐☐ | TIED TO DOCK | ☐☐ | AMERICAN RED CROSS |
| ☐ SINKING | ☐☐ IGNITION OF SPILLED FUEL / VAPOR | ☐☐ | LAUNCHING | ☐☐ | USCG AUXILIARY |
| ☐ STRUCK BY BOAT / PROPELLER | ☐☐ IMPROPER ANCHORING | ☐☐ | DOCKING / LEAVING DOCK | ☐☐ | US POWER SQUADRON |
| ☐ SKIER MISHAP | ☐☐ FAILURE TO VENT | ☐☐ | SAILING | ☒☐ | STATE COURSE |
| ☐ OTHER: ____ | ☐☐ OTHER: ____ | ☐☐ | OTHER (specify) ____ | ☐☐ | INFORMAL / NONE |

**OPERATOR EXPERIENCE**

| #1 #2 | |
|---|---|
| ☐☐ | UNDER 10 HOURS |
| ☐☐ | 10 TO 100 HOURS |
| ☐☐ | OVER 100 HOURS |

## VESSEL TYPE / HULL MATERIAL / PROPULSION / PERSONAL FLOTATION DEVICES / FIRE EXTINGUISHERS

| VESSEL TYPE #1 #2 | HULL MATERIAL #1 #2 | PROPULSION #1 #2 | PERSONAL FLOTATION DEVICES | FIRE EXTINGUISHERS |
|---|---|---|---|---|
| ☐☐ OPEN MOTORBOAT | ☐☐ WOOD | ☐☐ OUTBOARD | **VESSEL #1** | **VESSEL #1** |
| ☐☐ CABIN MOTORBOAT | ☐☐ ALUMINUM | ☐☐ INBOARD | Was vessel adequately equipped | Was the approved type of fir fighting |
| ☒☐ PERSONAL WATER CRAFT | ☒☐ FIBERGLASS | ☐☐ INBOARD / OUTBOARD | With Coast Guard approved PFD's?  ☒ YES  ☐ NO | Equipment on board?  ☒ YES  ☐ NO |
| ☐☐ HOUSEBOAT | ☐☐ PLASTIC | ☒☐ JET | Were they accessible?  ☒ YES  ☐ NO | Were they used?  ☐ YES  ☒ NO |
| ☐☐ SAILBOAT (aux engine) | ☐☐ RUBBER / VINYL | ☐☐ SAIL ONLY | Were they used?  ☒ YES  ☐ NO | |
| ☐☐ SAILBOAT (sail only) | ☐☐ OTHER (specify) ____ | ☐☐ PADDEL / OARS | | |
| ☐☐ CANOE / KAYAK | | ☐☐ OTHER (specify) ____ | **VESSEL #2** | **VESSEL #2** |
| ☐☐ RAFT | | | Was vessel adequately equipped | Was the approved type of fir fighting |
| ☐☐ ROWBOAT | | | With Coast Guard approved PFD's?  ☐ YES  ☐ NO | Equipment on board?  ☐ YES  ☐ NO |
| ☐☐ OTHER (specify) ____ | | | Were they accessible?  ☐ YES  ☐ NO | Were they used?  ☐ YES  ☐ NO |
| | | | Were they used?  ☐ YES  ☐ NO | |

## ACCIDENT NARRATIVE

See Attached.

| REPORT NUMBER | INVESTIGATED BY (NAME, RANK) | ID NUMBER | REVIEWED BY |
|---|---|---|---|
| | Oliver, Police Officer II | 4446 | _signature_   3590 |

DBW FORM VAR-1 NAPA SHERIFF VERSION (05/03)

12

# VESSEL ACCIDENT REPORT 1

CALIFORNIA DEPARTMENT OF BOATIN    WATERWAYS    PAGE 3 OF 8

| DATE OF ORIGINAL ACCIDENT | | | TIME (2400) | REPORT NUMBER |
|---|---|---|---|---|
| 7 | 29 | 2007 | 1845 | |

| DEPUTY NAME | DEPUTY ID |
|---|---|
| Oliver | 4446 |

| VICTIM / WITNESS NAME, ADDRESS & PHONE | VICTIM / WITNESS STATUS | RIDING IN VESSEL # | DOB/ AGE | INJURY DESCRIPTION | LIFE JACKET WORN? | COULD VICTIM SWIM? |
|---|---|---|---|---|---|---|
| Jason Adame 6511 Cowles Mountain Blvd., San Diego, CA 92115 (858)472-1402 | ☐ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☒ WITNESS ONLY | | 6/1/1986 21 | TAKEN TO HOSPITAL ☐ YES ☐ NO FACILITY | ☐YES ☐NO ☐UNKNOWN | ☐YES ☐NO ☐UNKNOWN |
| Megan Colombo 1162 La Rosa Road, Arcadia, CA 91007 (626)375-8092 | ☐ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☒ WITNESS ONLY | | 2/6/1991 17 | TAKEN TO HOSPITAL ☐ YES ☐ NO FACILITY | ☐YES ☐NO ☐UNKNOWN | ☐YES ☐NO ☐UNKNOWN |
| | ☐ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☐ WITNESS ONLY | | | TAKEN TO HOSPITAL ☐ YES ☐ NO FACILITY | ☐YES ☐NO ☐UNKNOWN | ☐YES ☐NO ☐UNKNOWN |
| | ☐ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☐ WITNESS ONLY | | | TAKEN TO HOSPITAL ☐ YES ☐ NO FACILITY | ☐YES ☐NO ☐UNKNOWN | ☐YES ☐NO ☐UNKNOWN |
| | ☐ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☐ WITNESS ONLY | | | TAKEN TO HOSPITAL ☐ YES ☐ NO FACILITY | ☐YES ☐NO ☐UNKNOWN | ☐YES ☐NO ☐UNKNOWN |
| | ☐ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☐ WITNESS ONLY | | | TAKEN TO HOSPITAL ☐ YES ☐ NO FACILITY | ☐YES ☐NO ☐UNKNOWN | ☐YES ☐NO ☐UNKNOWN |
| | ☐ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☐ WITNESS ONLY | | | TAKEN TO HOSPITAL ☐ YES ☐ NO FACILITY | ☐YES ☐NO ☐UNKNOWN | ☐YES ☐NO ☐UNKNOWN |

DBW FORM VAR 1.1 NAPA SHERIFF VERSION (09/03)

13

| VESSEL ACCIDENT REPORT | | DEPARTMENT OF BOATING AND WATERWAYS | PAGE 4 OF 8 | |
|---|---|---|---|---|

| SUPPLEMENTAL / NARRATIVE (CHECK ONE) | DATE OF ACCIDENT | TIME (2400) | REPORT NUMBER | CITATION NUMBER |
|---|---|---|---|---|
| X   Narrative Continuation Vessel Accident Report | 07-29-2007 | 1845 | | |
| | LOCATION | | | BEAT |
| Supplemental Vessel Accident Report | MISSION BAY/S. PACIFIC PWC AREA | | | 123 |
| | CITY | COUNTY | | AGENCY |
| Other | SAN DIEGO | SAN DIEGO | | S.D. POLICE |

## SYNOPSIS:

Kohl was operating a personal watercraft counter clockwise in the South Pacific Passage personal watercraft area. Colombo and Slagel were aboard as passengers. Kohl maneuvered the vessel in a manner that caused Colombo and Slagel to fall overboard. This caused serious injury to both.

## SCENE:

The incident occurred in the South Pacific Passage personal watercraft area of Mission Bay. The area is restricted to personal watercraft only with an open speed limit. The traffic has a directional requirement of a counter clockwise rotation. The vessel activity was moderate and the wind speed was light at 3 knots out of the west. These two combined factors resulted in choppy water conditions. The incident occurred in the daylight hours with approximately 9 miles of visibility. The tide was 2.1 at 1511 hours and was flooding. The next high tide was at 2125 hours. The location of the incident was approximately 200 feet south of the north shoreline of the Fiesta Island access road and 225 feet northwest of the south shoreline of South Shores Park.

## ORIGIN:

On 07/29/2007, at approximately 1845 hours, Sgt. M. Heacox #3950 and I responded in a marked police vehicle to a report of boating accident with injuries. Officer M. Soulia #4262 responded and arrived aboard a marked police vessel.

## VESSEL #1:

Kohl was operating a ten foot six inch, 2007 Bombardier, Sea-Doo GTI personal watercraft, bearing CF# 8326RM. The vessel is propelled with a 130 horse powered water jet. The hull color was white with a yellow seat and cowling. It contained all the proper carriage equipment. I saw no damage to the vessel.

Both of the watercraft used to transport the victims had a large amount of blood mixed with water in the foot wells. There was no blood on the seats.

## PROPERTY DAMAGE:

None.

| PREPARED BY (NAME RANK) | DATE | | | ID NUMBER. | REVIEWED BY (NAME, RANK) | DATE | | | ID NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| R. OLIVER, P.O. II | 07 | 29 | 2007 | 4446 | | 08 | 06 | 07 | 3590 |

DBW FORM VAR – 2 (1/00)

**VESSEL ACCIDENT REPORT**

DEPARTMENT OF BOATING AND WATERWAYS    PAGE 5 OF 8

| SUPPLEMENTAL / NARRATIVE (CHECK ONE) | DATE OF ACCIDENT | TIME (2400) | REPORT NUMBER | CITATION NUMBER |
|---|---|---|---|---|
| X  Narrative Continuation Vessel Accident Report | 07-29-2007 | 1845 | | |
| | LOCATION | | | BEAT |
| Supplemental Vessel Accident Report | MISSION BAY/S. PACIFIC PWC AREA | | | 123 |
| | CITY | COUNTY | | AGENCY |
| Other | SAN DIEGO | SAN DIEGO | | S.D. POLICE |

## INVESTIGATION:

Officer Soulia arrived at the beach where Colombo and Slagel were receiving medical attention for what appeared to be injuries to their groin area. San Diego Lifeguards Stropky #5564 and Messenger #8054 responded with Paramedic Unit #20 to provide medical attention to the victims. I spoke to the operator of the personal watercraft Brett Kohl regarding the incident. I spoke with witnesses Megan Colombo and Jason Adame. Their statements are listed below. The paramedics transported Colombo and Slagel to U.C.S.D. hospital. They were both admitted for serious injuries to their groin area, each requiring surgery.

On 07-30-2007 Sgt. Heacox and I went to U.C.S.D. Hospital and spoke with Colombo and Slagel. I spoke with them about their condition and the incident. Their statements are listed below.

## STATEMENTS:

### Statement of Brett C. Kohl /Operator of Vessel #1:

Kohl said he works for Mission Bay Jet Sports. Both the watercraft belongs to the business owner Robert Adamson. Kohl said he had permission from Adamson to have the watercraft after hours. Kohl told me he was not driving erratically or fast. He said he was only going 5mph, hit a wake and the girls fell off the back. I told him their injuries were not consistent with his statement. I told Kohl that it was important that the paramedics know the accurate speed of the vessel when the girls fell off. It was important because necessary precautions, such as a C-Spine, need to be taken to avoid further injury. Kohl was adamant that he had only been going 5mph.

### Statement of Haley C. Colombo/Passenger aboard Vessel #1:

Colombo told me she did not know Kohl. Kohl was a mutual friend of Jason Adame's. She said Kohl works at a "jet ski" rental place. Kohl and Adame brought personal watercraft from the business to the beach. Colombo said she had never been on a "jet ski" so she did not want to go alone. Slagel went with her. Kohl was operating the vessel. Slagel was in the middle. Colombo said she was on the back. Colombo told me Kohl went slow at first. When they reached the personal watercraft area Kohl drove fast in tight circles. Colombo estimated his speed in the circles to be 35mph. She said Kohl intentionally threw her and Slagel off the watercraft. They were too far to swim back to their camp and did not want to get back on the vessel with him. Colombo told Kohl, "Please don't do it again, it hurt please...please." Colombo said she knew Kohl heard her. She and Slagel got back aboard the vessel. About one minute later Kohl repeated the maneuver and threw them into the water causing her injury. Colombo told me they fell off the rear of the vessel. She said she knew she was seriously injured and there was blood in the water. Colombo got back aboard the watercraft and Kohl took her to the beach.

| PREPARED BY (NAME RANK) | DATE | | | ID NUMBER | REVIEWED BY (NAME, RANK) | DATE | | | ID NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| R. OLIVER, P.O. II | 07 | 29 | 2007 | 4446 | | 8 | 6 | 07 | 3550 |

DBW FORM VAR – 2 (1/00)

1.5

**VESSEL ACCIDENT REPORT**

| SUPPLEMENTAL / NARRATIVE (CHECK ONE) | | DATE OF ACCIDENT | TIME (2400) | REPORT NUMBER | CITATION NUMBER |
|---|---|---|---|---|---|
| X | Narrative Continuation Vessel Accident Report | 07-29-2007 | 1845 | | |
| | Supplemental Vessel Accident Report | LOCATION MISSION BAY/S. PACIFIC PWC AREA | | | BEAT 123 |
| | Other | CITY SAN DIEGO | COUNTY SAN DIEGO | | AGENCY S.D. POLICE |

DEPARTMENT OF BOATING AND WATERWAYS    PAGE 6 OF 8

Slagel went back to the beach aboard the other watercraft. The paramedics were called and both girls were transported to the hospital.

### Statement of Jessica L. Slagel/Passenger aboard Vessel #1:

Slagel said she has experience operating personal watercraft. Colombo had never been on one before. She said Colombo wanted her to go with her. Kohl was driving. She said she was seated in the middle and Colombo was on the back. Slagel told me that right from the beach, in the 5mph area, Kohl was speeding. When he got to the personal watercraft area he sped up even faster. She felt his speed was unsafe because of the number of other watercraft in the area. Slagel said Kohl kept cutting off other drivers. Kohl was doing tight counter clockwise rotations at a high rate of speed. Colombo estimated his speed going into the circles to be 25mph. She said Kohl was trying to throw them off. He attempted to throw them off the personal watercraft three times before both she and Colombo where thrown overboard. Kohl came back for them. Slagel told Kohl, "Please don't do that to us again. It scared us and your gonna get us hurt. We don't want to get back on so promise us." Kohl replied, "I promise I wont." Slagel said she and Colombo got back on and less than two minutes later Kohl intentionally threw them off again. She said they fell to the rear of the vessel. Slagel said she knew she was hurt but refused to get on the watercraft with him again. Kohl took Colombo to shore and Slagel got a ride on the other watercraft. Slagel said after everyone returned to the camp and the paramedics were called. Kohl made a sarcastic remark about what happened but she couldn't specify what it was. Slagel said she told Kohl that this was his fault and "he acted like he didn't even care and it was no big deal."

### Statement of Megan Colombo/Witness:

Colombo said she did not see the incident but just before Kohl was driving fast. She pointed to a personal watercraft that was traveling about 20mph and said he was going a little faster than that. She estimated Kohl's speed just before the incident at 25mph.

### Statement of Jason Adame/Witness:

Adame told me he saw the incident out of the corner of his eye. He looked over after the girls fell off the watercraft. He said he did not notice Adame driving erratically or doing circles.

### EVIDENCE:

None.

| PREPARED BY (NAME RANK) | DATE | | | ID NUMBER | REVIEWED BY (NAME, RANK) | DATE | | | ID NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| R. OLIVER, P.O. II | 07 | 29 | 2007 | 4446 | | 8 | 6 | 07 | 3590 |

DBW FORM VAR-2 (1/00)

1.16

VESSEL ACCIDENT REPORT                    DEPARTMENT OF BOATING AND WATERWAYS    PAGE 7 OF 8

| SUPPLEMENTAL / NARRATIVE (CHECK ONE) | DATE OF ACCIDENT | TIME (2400) | REPORT NUMBER | CITATION NUMBER |
|---|---|---|---|---|
| X  Narrative Continuation Vessel Accident Report | 07-29-2007 | 1845 | | |
| | LOCATION | | | BEAT |
| Supplemental Vessel Accident Report | MISSION BAY/S. PACIFIC PWC AREA | | | 123 |
| | CITY | COUNTY | | AGENCY |
| Other | SAN DIEGO | SAN DIEGO | | S.D. POLICE |

## INJURIES:

Colombo had a torn rectum that extended into the muscle tissue. She had to have both the tissues and muscles repaired surgically. It is estimated that she will need to use a colostomy bag for six months to a year.

Slagel had a six-inch laceration from her rectum to her vagina that required surgery. She is expected to recover in three to six weeks.

Colombo and Slagel's injuries were most likely caused by direct contact or hyper pressure from the jet thrust, expelled from the 130 horse powered engine. Although not common, vaginal and/or rectal injuries have been caused by the jet blast of personal watercraft. This has been documented in many medical journals since at least 1999. For instance, see The Journal of Trauma: Injury, Infection, and Critical Care – Abstract 47(2) August 1999.

Additionally, the manufacturer's website, www.sea-doo.com, cautions "DO NOT APPLY THROTTLE WHEN ANYONE IS AT REAR OF PWC – turn engine off or keep engine at idle. Water and/or debris exiting jet thrust nozzle can cause severe injury." There is also a warning sticker affixed by the manufacturer to the stern of the vessel stating such.

## CONCLUSION:

Kohl intentionally threw Colombo and Slagel overboard. Neither passenger wanted to get back aboard with Kohl. Kohl promised not to throw them overboard, again. Colombo and Slagel got back on the personal watercraft. Kohl intentionally threw them overboard, a second time, causing their injuries.

Kohl was negligent and showed extreme indifference to the physical and psychological well being of the passengers on board. Kohl demonstrated this by repeating the maneuver when told not to do so. Kohl is an adult who is twenty-one years of age. Both his passengers are children under the age of eighteen. Kohl willfully caused both children to be placed in a situation where they were endangered and ultimately caused them great bodily harm.

Pursuant to Title 14, California Code of Regulations, Section 6600.1, the Federal Inland and International Navigation Rules have been incorporated by reference to California law. The following violation of navigational law occurred.

Kohl was operating the personal watercraft at an excessive speed for the turning maneuvers made. He did this intentionally and caused his two passengers to fall overboard.

Kohl violated Title 14, CCR, Section 6600.1, Title 33 USC, Part B:

| PREPARED BY (NAME RANK) | DATE | | | ID NUMBER | REVIEWED BY (NAME, RANK) | DATE | | | ID NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| R. OLIVER, P.O. II | 07 | 29 | 2007 | 4446 | | 8 | 6 | 07 | 3590 |

DBW FORM VAR – 2 (1/00)                                                                                                   17

| VESSEL ACCIDENT REPORT | | DEPARTMENT OF BOATING AND WATERWAYS    PAGE  of  8 | | |
|---|---|---|---|---|
| SUPPLEMENTAL / NARRATIVE (CHECK ONE) | DATE OF ACCIDENT 07-29-2007 | TIME (2400) 1845 | REPORT NUMBER | CITATION NUMBER |
| X   Narrative Continuation Vessel Accident Report | LOCATION MISSION BAY/S. PACIFIC PWC AREA | | | BEAT 123 |
| ___  Supplemental Vessel Accident Report | CITY SAN DIEGO | COUNTY SAN DIEGO | | AGENCY S.D. POLICE |
| ___  Other | | | | |

Rule 6, Safe Speed;

"Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions."
"In determining a safe speed the following factors shall be among those taken into account:"
   "(a) By all vessels:
      (i)  the state of visibility;
(ii) the traffic density including concentration of fishing vessels or any other vessels;"


Kohl also violated both state and local laws:

655 H&N (Harbors and Navigation Code) Reckless, negligent operation;

"(a) No person shall use any vessel or manipulate water skis, an aquaplane, or a similar device in a reckless or negligent manner so as to endanger the life, limb or property of any person. The department shall adopt regulations for the use of vessels, water skis, aquaplanes, or similar devices in a manner that will minimize the danger to life, limb, or property consistent with reasonable use of the equipment for the purpose for which it was designed."

63.20.28 SDMC (San Diego Municipal Code) Endangering Aquatic Activities;

"No person shall use any surfboard, paddleboard, belly board, skim board, ski, canoe, boat or vessel of any type, or any similar device in a negligent manner so as to endanger the life, limb or property of another person."

| PREPARED BY (NAME RANK) R. OLIVER, P.O. II | DATE 07 | 29 | 2007 | ID NUMBER 4446 | REVIEWED BY (NAME/RANK) | DATE 8 | 6 | 07 | ID NUMBER 3590 |
|---|---|---|---|---|---|---|---|---|---|

DBW FORM VAR – 2 (1/00)

18

**EXHIBIT B**

08-17-2007 RCVD

# VESSEL ACCIDENT REPORT

CALIFORNIA DEPARTMENT OF BOATING WATERWAYS  PAGE 1 OF 8

| AGENCY NAME TAKING REPORT | NO INJURED | NO KILLED | AGENCY REPORT NUMBER |
|---|---|---|---|
| San Diego Police/Harbor Unit | 2 | 0 | |

**WATERBODY ACCIDENT OCCURRED ON**
Mission Bay

| MONTH | DAY | YEAR | TIME (2400) |
|---|---|---|---|
| 7 | 29 | 2007 | 1845 |

| COUNTY ACCIDENT OCCURRED IN | NEAREST LANDMARK (NAVIGATION AID) | INVESTIGATED BY  PHONE (619) 221-8985 |
|---|---|---|
| San Diego | South Pacific Passage Personal Watercraft Area | Oliver |

### CREATOR / VESSEL

| NAME (FIRST, MIDDLE, LAST) | STREET / MAILING ADDRESS |
|---|---|
| Brett Charles Kohl | 2746 Luna Avenue |

| IDENTIFICATION | DOB / AGE | SEX | CITY | STATE | ZIP | PHONE (619) |
|---|---|---|---|---|---|---|
| D5333031 | 7/23/1986  21 | ☒ MALE ☐ FEMALE | San Diego, CA 92117 | | | 822-9584 |

| VESSEL YEAR | MAKE / MODEL / LENGTH | VESSEL NUMBER (CF OR DOC) | VESSEL NAME | ACTIVITY |
|---|---|---|---|---|
| 2007 | Bomb/SeaDoo GTI/10'6" | 8326RM | | ☐ RECREATIONAL ☐ WORKBOAT ☐ COMMERCIAL ☒ RENTAL |

| HULL IDENTIFICATION NUMBER ☐ NONE | HORSEPOWER | RENTED | OWNER'S NAME ☐ SAME | PHONE |
|---|---|---|---|---|
| YDV09441C707 | 130 hp | ☒ YES ☐ NO | Robert Adamson | 220-0334 |

| DIRECTION OF TRAVEL | # PERSONS ON BOARD | VESSEL DAMAGE | OWNER'S STREET / MAILING ADDRESS ☐ SAME |
|---|---|---|---|
| Counter Clockwise Circles | 3 | ☐ MINOR ☒ MODERATE ☐ MAJOR ☐ TOTAL | Mission Bay Jet Sports 5370 Napa Street |

| ESTIMATED SPEED | DISPOSITION OF VESSEL | ESTIMATED DAMAGE $ ☒ NONE | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| 25-35 mph | Operator | | San Diego, CA 92110 | | |

### CREATOR / SWIMMER / MOORED VESSEL / OTHER

| NAME (FIRST, MIDDLE, LAST) | STREET / MAILING ADDRESS |
|---|---|
| | |

| IDENTIFICATION | DOB / AGE | SEX | CITY | STATE | ZIP | PHONE ( ) |
|---|---|---|---|---|---|---|
| | | ☐ MALE ☐ FEMALE | | | | |

| VESSEL YEAR | MAKE / MODEL / LENGTH | VESSEL NUMBER (CF OR DOC) | VESSEL NAME | ACTIVITY |
|---|---|---|---|---|
| | | | | ☐ RECREATIONAL ☐ WORKBOAT ☐ COMMERCIAL ☐ RENTAL |

| HULL IDENTIFICATION NUMBER ☐ NONE | HORSEPOWER | RENTED | OWNER'S NAME ☐ SAME | PHONE ( ) |
|---|---|---|---|---|
| | | ☐ YES ☐ NO | | |

| DIRECTION OF TRAVEL | # PERSONS ON BOARD | VESSEL DAMAGE | OWNER'S STREET / MAILING ADDRESS ☐ SAME |
|---|---|---|---|
| | | ☐ MINOR ☐ MODERATE ☐ MAJOR ☐ TOTAL | |

| ESTIMATED SPEED | DISPOSITION OF VESSEL | ESTIMATED DAMAGE $ ☐ NONE | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| | | | | | |

### OTHER PROPERTY

| DESCRIPTION OF DAMAGE | ESTIMATED DAMAGE $ ☐ NONE |
|---|---|
| | |

| OWNER'S NAME | ADDRESS | STATE | ZIP | PHONE ( ) | NOTIFIED ☐ YES ☐ NO |
|---|---|---|---|---|---|
| | | | | | |

### INJURED PERSON / WITNESS

| VICTIM / WITNESS NAME, ADDRESS & PHONE | VICTIM / WITNESS STATUS | RIDING IN VESSEL # | DOB / AGE | INJURY DESCRIPTION | LIFEJACKET WORN? | COULD VICTIM SWIM? |
|---|---|---|---|---|---|---|
| Haley Coleen Colombo 1162 La Rosa Road, Arcadia, CA 91007 (626)254-9959 | ☒ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☐ WITNESS ONLY | P1 | 2/6/1991  16 | Torn Rectum requiring surgery.  TAKEN TO HOSPITAL ☒ YES ☐ NO  FACILITY UCSD/Dr. Lee | ☒ YES ☐ NO ☐ UNKNOWN | ☒ YES ☐ NO ☐ UNKNOWN |
| Jessica Lynn Slagel 602 Fairview Avenue #5, Arcadia, CA 91007 (626)294-2994 | ☒ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☐ WITNESS ONLY | P1 | 1/19/1990  17 | Torn Vagina to Rectum requiring surgery.  TAKEN TO HOSPITAL ☒ YES ☐ NO  FACILITY UCSD/Dr. Kingston | ☒ YES ☐ NO ☐ UNKNOWN | ☒ YES ☐ NO ☐ UNKNOWN |

**SKETCH (INCLUDE VESSEL, WIND, CURRENT DIRECTION)**
NOT TO SCALE

FIESTA ISLAND

P1

SOUTH PACIFIC PASSAGE PWC AREA

SOUTH SHORES

INDICATE TRUE NORTH

**MISCELLANEOUS**
N 32o 46.094
W 117o 12.634

| COPY OF STATE FORM A-1 GIVEN TO OPERATOR(S) | ☐ OPERATOR 1 ☐ OPERATOR 2 |
|---|---|

☐ COAST GUARD
☒ CALIFORNIA BOATING AND WATERWAYS 2000 EVERGREEN STREET, SUITE 100 SACRAMENTO CA 95815-3888
☐ CORONER  ☒ MARINE UNIT
☐ OTHER:

Exhibit 1

R. Oliver, 2/26/08

DBW FORM VAR-1 NAPA SHERIFF VERSION (06/03)

# VESSEL ACCIDENT REPORT

CALIFORNIA DEPARTMENT OF BOATING & WATERWAYS      PAGE 2 OF 8

| WEATHER | WATER CONDITIONS | WAVE SIZE | WIND | LIGHTING | VISIBILITY |
|---|---|---|---|---|---|
| ☒ CLEAR | ☐ CALM | ☒ LESS THAN 6" | ☐ NONE | ☒ DAYLIGHT | ☒ GOOD ☐ FAIR ☐ POOR |
| ☐ CLOUDY | ☒ CHOPPY | ☐ 6" – 2' | ☐ LIGHT (0 – 6 mph) | ☐ DARK | |
| ☐ RAIN | ☐ ROUGH | ☐ 2' – 6' | ☐ MODERATE (7 – 14 mph) | ☐ DUSK OR DAWN | **TEMPERATURE** |
| ☐ FOG | ☐ VERY ROUGH | ☐ > 6' | ☐ STRONG (15 – 25 mph) | ☐ ARTIFICIAL LIGHT | |
| ☐ SNOW | | | ☐ STORM ( 25 mph & over) | ☐ OTHER (specify) | WATER 72 AIR 66 |
| ☐ HAZY | | | | | |

## TYPE OF ACCIDENT

| | #1 #2 | CAUSE OF ACCIDENT | #1 #2 | OPERATION/TIME OF ACCIDENT | #1 #2 | SOBRIETY / DRUG USE |
|---|---|---|---|---|---|---|
| ☐ CAPSIZING | ☐ ☐ | IMPROPER LOOKOUT / INATTENTION | ☐ ☐ | CRUISING | ☒ ☐ | HAD NOT BEEN DRINKING |
| ☐ COLLISION WITH VESSEL | ☐ ☐ | OPERATOR INEXPERIENCE | ☒ ☐ | CHANGING DIRECTION | ☐ ☐ | HBD NOT UNDER INFLUENCE |
| ☐ COLLISION WITH FIXED OBJECT | ☒ ☐ | EXCESSIVE SPEED | ☐ ☐ | CHANGING SPEED | ☐ ☐ | HBD UNDER INFLUENCE |
| ☐ COLLISION WITH FLOATING OBJECT | ☐ ☐ | MACHINERY FAILURE | ☐ ☐ | TOWING SKIER / TUBER | ☐ ☐ | HBD IMPAIRMENT UNKNOWN |
| ☒ FALL OVERBOARD | ☐ ☐ | EQUIPMENT FAILURE | ☐ ☐ | TOWING SKIER - SKIER DOWN | ☐ ☐ | UNDER DRUG INFLUENCE |
| ☐ FALL IN BOAT | ☐ ☐ | OFF-THROTTLE STEERING INABILITY | ☐ ☐ | TOWING ANOTHER VESSEL | ☐ ☐ | OTHER PHYSICAL IMPAIRMENT |
| ☐ FIRE / EXPLOSION (fuel) | ☐ ☐ | IMPROPER LOADING | ☐ ☐ | BEING TOWED BY ANOTHER VESSEL | ☐ ☐ | IMPAIRMENT UNKNOWN |
| ☐ FIRE / EXPLOSION (other than fuel) | ☐ ☐ | OVERLOADING | ☐ ☐ | DRIFTING | ☐ ☐ | NO OPERATOR |
| ☐ FLOODING / SWAMPING | ☐ ☐ | HAZARDOUS WEATHER / WATER | ☐ ☐ | AT ANCHOR | | **OPERATOR EDUCATION** |
| ☐ GROUNDING | ☐ ☐ | RESTRICTED VISION | ☐ ☐ | TIED TO DOCK | ☐ ☐ | AMERICAN RED CROSS |
| ☐ SINKING | ☐ ☐ | IGNITION OF SPILLED FUEL / VAPOR | ☐ ☐ | LAUNCHING | ☐ ☐ | USCG AUXILIARY |
| ☐ STRUCK BY BOAT / PROPELLER | ☐ ☐ | IMPROPER ANCHORING | ☐ ☐ | DOCKING / LEAVING DOCK | ☐ ☐ | US POWER SQUADRON |
| ☐ SKIER MISHAP | ☐ ☐ | FAILURE TO VENT | ☐ ☐ | SAILING | ☐ ☐ | STATE COURSE |
| ☐ OTHER:_____ | ☐ ☐ | OTHER:_____ | ☐ ☐ | OTHER (specify) _____ | ☒ ☐ | INFORMAL |
| | | | | | ☐ ☐ | NONE |

**OPERATOR EXPERIENCE**

| #1 #2 | |
|---|---|
| ☐ ☐ | UNDER 10 HOURS |
| ☐ ☐ | 10 TO 100 HOURS |
| ☐ ☐ | OVER 100 HOURS |

## VESSEL TYPE

| #1 #2 | | #1 #2 | HULL MATERIAL & SIZE | #1 #2 | PROPULSION |
|---|---|---|---|---|---|
| ☐ ☐ | OPEN MOTORBOAT | ☐ ☐ | WOOD | ☐ ☐ | OUTBOARD |
| ☐ ☐ | CABIN MOTORBOAT | ☐ ☐ | ALUMINUM | ☐ ☐ | INBOARD |
| ☒ ☐ | PERSONAL WATER CRAFT | ☒ ☐ | FIBERGLASS | ☐ ☐ | INBOARD / OUTBOARD |
| ☐ ☐ | HOUSEBOAT | ☐ ☐ | PLASTIC | ☒ ☐ | JET |
| ☐ ☐ | SAILBOAT (aux engine) | ☐ ☐ | RUBBER / VINYL | ☐ ☐ | SAIL ONLY |
| ☐ ☐ | SAILBOAT (sail only) | ☐ ☐ | OTHER (specify) | ☐ ☐ | PADDEL / OARS |
| ☐ ☐ | CANOE / KAYAK | | _____ | ☐ ☐ | OTHER (specify) |
| ☐ ☐ | RAFT | | | | _____ |
| ☐ ☐ | ROWBOAT | | | | |
| ☐ ☐ | OTHER (specify) _____ | | | | |

### PERSONAL FLOTATION DEVICES

**VESSEL #1**

Was vessel adequately equipped With Coast Guard approved PFD's?   ☒ YES  ☐ NO

Were they accessible?   ☒ YES  ☐ NO

Were they used?   ☒ YES  ☐ NO

**VESSEL #2**

Was vessel adequately equipped With Coast Guard approved PFD's?   ☐ YES  ☐ NO

Were they accessible?   ☐ YES  ☐ NO

Were they used?   ☐ YES  ☐ NO

### FIRE EXTINGUISHERS

**VESSEL #1**

Was the approved type of fir fighting Equipment on board?   ☒ YES  ☐ NO

Were they used?   ☐ YES  ☒ NO

**VESSEL #2**

Was the approved type of fir fighting Equipment on board?   ☐ YES  ☐ NO

Were they used?   ☐ YES  ☐ NO

## ACCIDENT NARRATIVE

See Attached.

| REPORT NUMBER | INVESTIGATED BY (NAME, RANK) | ID NUMBER | REVIEWED BY |
|---|---|---|---|
| | Oliver, Police Officer II | 4446 | 3590 |

DBW FORM VAR-1 NAPA SHERIFF VERSION (08/03)

I.2

# VESSEL ACCIDENT REPORT 1

CALIFORNIA DEPARTMENT OF BOATING    WATERWAYS    PAGE 3 OF 8

| DATE OF ORIGINAL ACCIDENT | | | TIME (2400) | REPORT NUMBER |
|---|---|---|---|---|
| 7 | 29 | 2007 | 1845 | |

| DEPUTY NAME | DEPUTY ID |
|---|---|
| Oliver | 4446 |

| VICTIM / WITNESS NAME, ADDRESS & PHONE | VICTIM / WITNESS STATUS | RIDING IN VESSEL # | DOB/ AGE | INJURY DESCRIPTION | LIFE JACKET WORN? | COULD VICTIM SWIM? |
|---|---|---|---|---|---|---|
| Jason Adame 6511 Cowles Mountain Blvd., San Diego, CA 92115 (858)472-1402 | ☐ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☒ WITNESS ONLY | | 6/1/1986 21 | TAKEN TO HOSPITAL ☐ YES ☐ NO FACILITY | ☐YES ☐NO ☐UNKNOWN | ☐YES ☐NO ☐UNKNOWN |
| Megan Colombo 1162 La Rosa Road, Arcadia, CA 91007 (626)375-8092 | ☐ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☒ WITNESS ONLY | | 2/6/1991 17 | TAKEN TO HOSPITAL ☐ YES ☐ NO FACILITY | ☐YES ☐NO ☐UNKNOWN | ☐YES ☐NO ☐UNKNOWN |
| | ☐ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☐ WITNESS ONLY | | | TAKEN TO HOSPITAL ☐ YES ☐ NO FACILITY | ☐YES ☐NO ☐UNKNOWN | ☐YES ☐NO ☐UNKNOWN |
| | ☐ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☐ WITNESS ONLY | | | TAKEN TO HOSPITAL ☐ YES ☐ NO FACILITY | ☐YES ☐NO ☐UNKNOWN | ☐YES ☐NO ☐UNKNOWN |
| | ☐ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☐ WITNESS ONLY | | | TAKEN TO HOSPITAL ☐ YES ☐ NO FACILITY | ☐YES ☐NO ☐UNKNOWN | ☐YES ☐NO ☐UNKNOWN |
| | ☐ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☐ WITNESS ONLY | | | TAKEN TO HOSPITAL ☐ YES ☐ NO FACILITY | ☐YES ☐NO ☐UNKNOWN | ☐YES ☐NO ☐UNKNOWN |
| | ☐ INJURED ☐ DECEASED ☐ DISAPPEARED ☐ PASSENGER ONLY ☐ WITNESS ONLY | | | TAKEN TO HOSPITAL ☐ YES ☐ NO FACILITY | ☐YES ☐NO ☐UNKNOWN | ☐YES ☐NO ☐UNKNOWN |

DBW FORM VAR 1.1 NAPA SHERIFF VERSION (09/03)

13

| VESSEL ACCIDENT REPORT | | DEPARTMENT OF BOATING AND WATERWAYS | PAGE 4 OF 8 | |
|---|---|---|---|---|
| SUPPLEMENTAL / NARRATIVE (CHECK ONE) | | DATE OF ACCIDENT 07-29-2007 | TIME (2400) 1845 | REPORT NUMBER | CITATION NUMBER |
| X   Narrative Continuation Vessel Accident Report | | | | |
| Supplemental Vessel Accident Report | | LOCATION MISSION BAY/S. PACIFIC PWC AREA | | BEAT 123 |
| Other | | CITY SAN DIEGO | COUNTY SAN DIEGO | AGENCY S.D. POLICE |

## SYNOPSIS:

Kohl was operating a personal watercraft counter clockwise in the South Pacific Passage personal watercraft area. Colombo and Slagel were aboard as passengers. Kohl maneuvered the vessel in a manner that caused Colombo and Slagel to fall overboard. This caused serious injury to both.

## SCENE:

The incident occurred in the South Pacific Passage personal watercraft area of Mission Bay. The area is restricted to personal watercraft only with an open speed limit. The traffic has a directional requirement of a counter clockwise rotation. The vessel activity was moderate and the wind speed was light at 3 knots out of the west. These two combined factors resulted in choppy water conditions. The incident occurred in the daylight hours with approximately 9 miles of visibility. The tide was 2.1 at 1511 hours and was flooding. The next high tide was at 2125 hours. The location of the incident was approximately 200 feet south of the north shoreline of the Fiesta Island access road and 225 feet northwest of the south shoreline of South Shores Park.

## ORIGIN:

On 07/29/2007, at approximately 1845 hours, Sgt. M. Heacox #3950 and I responded in a marked police vehicle to a report of boating accident with injuries. Officer M. Soulia #4262 responded and arrived aboard a marked police vessel.

## VESSEL #1:

Kohl was operating a ten foot six inch, 2007 Bombardier, Sea-Doo GTI personal watercraft, bearing CF# 8326RM. The vessel is propelled with a 130 horse powered water jet. The hull color was white with a yellow seat and cowling. It contained all the proper carriage equipment. I saw no damage to the vessel.

Both of the watercraft used to transport the victims had a large amount of blood mixed with water in the foot wells. There was no blood on the seats.

## PROPERTY DAMAGE:

None.

| PREPARED BY (NAME RANK) R. OLIVER, P.O. II | DATE 07 \| 29 \| 2007 | ID NUMBER. 4446 | REVIEWED BY (NAME, RANK) | DATE 08 \| 06 \| 07 | ID NUMBER 3590 |
|---|---|---|---|---|---|

DBW FORM VAR – 2 (1/00)

14

| VESSEL ACCIDENT REPORT | | DEPARTMENT OF BOATING AND WATERWAYS    PAGE 5 OF 8 | | |
|---|---|---|---|---|
| SUPPLEMENTAL / NARRATIVE (CHECK ONE) | DATE OF ACCIDENT 07-29-2007 | TIME (2400) 1845 | REPORT NUMBER | CITATION NUMBER |
| X  Narrative Continuation Vessel Accident Report | LOCATION MISSION BAY/S. PACIFIC PWC AREA | | | BEAT 123 |
| Supplemental Vessel Accident Report | CITY SAN DIEGO | COUNTY SAN DIEGO | | AGENCY S.D. POLICE |
| Other | | | | |

## INVESTIGATION:

Officer Soulia arrived at the beach where Colombo and Slagel were receiving medical attention for what appeared to be injuries to their groin area. San Diego Lifeguards Stropky #5564 and Messenger #8054 responded with Paramedic Unit #20 to provide medical attention to the victims. I spoke to the operator of the personal watercraft Brett Kohl regarding the incident. I spoke with witnesses Megan Colombo and Jason Adame. Their statements are listed below. The paramedics transported Colombo and Slagel to U.C.S.D. hospital. They were both admitted for serious injuries to their groin area, each requiring surgery.

On 07-30-2007 Sgt. Heacox and I went to U.C.S.D. Hospital and spoke with Colombo and Slagel. I spoke with them about their condition and the incident. Their statements are listed below.

## STATEMENTS:

### Statement of Brett C. Kohl /Operator of Vessel #1:

Kohl said he works for Mission Bay Jet Sports. Both the watercraft belongs to the business owner Robert Adamson. Kohl said he had permission from Adamson to have the watercraft after hours. Kohl told me he was not driving erratically or fast. He said he was only going 5mph, hit a wake and the girls fell off the back. I told him their injuries were not consistent with his statement. I told Kohl that it was important that the paramedics know the accurate speed of the vessel when the girls fell off. It was important because necessary precautions, such as a C-Spine, need to be taken to avoid further injury. Kohl was adamant that he had only been going 5mph.

### Statement of Haley C. Colombo/Passenger aboard Vessel #1:

Colombo told me she did not know Kohl. Kohl was a mutual friend of Jason Adame's. She said Kohl works at a "jet ski" rental place. Kohl and Adame brought personal watercraft from the business to the beach. Colombo said she had never been on a "jet ski" so she did not want to go alone. Slagel went with her. Kohl was operating the vessel. Slagel was in the middle. Colombo said she was on the back. Colombo told me Kohl went slow at first. When they reached the personal watercraft area Kohl drove fast in tight circles. Colombo estimated his speed in the circles to be 35mph. She said Kohl intentionally threw her and Slagel off the watercraft. They were too far to swim back to their camp and did not want to get back on the vessel with him. Colombo told Kohl, "Please don't do it again, it hurt please...please." Colombo said she knew Kohl heard her. She and Slagel got back aboard the vessel. About one minute later Kohl repeated the maneuver and threw them into the water causing her injury. Colombo told me they fell off the rear of the vessel. She said she knew she was seriously injured and there was blood in the water. Colombo got back aboard the watercraft and Kohl took her to the beach.

| PREPARED BY (NAME RANK) R. OLIVER, P.O. II | DATE 07 | 29 | 2007 | ID NUMBER 4446 | REVIEWED BY (NAME, RANK) | DATE 8 | 6 | 07 | ID NUMBER 3590 |
|---|---|---|---|---|---|---|---|---|---|

DBW FORM VAR – 2 (1/00)

1.5

**VESSEL ACCIDENT REPORT**                    DEPARTMENT OF BOATING AND WATERWAYS     PAGE 6 OF 8

| SUPPLEMENTAL / NARRATIVE (CHECK ONE) | DATE OF ACCIDENT | TIME (2400) | REPORT NUMBER | CITATION NUMBER |
|---|---|---|---|---|
| X   Narrative Continuation Vessel Accident Report | 07-29-2007 | 1845 | | |
| | LOCATION | | | BEAT |
| Supplemental Vessel Accident Report | MISSION BAY/S. PACIFIC PWC AREA | | | 123 |
| | CITY | COUNTY | | AGENCY |
| Other | SAN DIEGO | SAN DIEGO | | S.D. POLICE |

Slagel went back to the beach aboard the other watercraft. The paramedics were called and both girls were transported to the hospital.

### Statement of Jessica L. Slagel/Passenger aboard Vessel #1:

Slagel said she has experience operating personal watercraft. Colombo had never been on one before. She said Colombo wanted her to go with her. Kohl was driving. She said she was seated in the middle and Colombo was on the back. Slagel told me that right from the beach, in the 5mph area, Kohl was speeding. When he got to the personal watercraft area he sped up even faster. She felt his speed was unsafe because of the number of other watercraft in the area. Slagel said Kohl kept cutting off other drivers. Kohl was doing tight counter clockwise rotations at a high rate of speed. Colombo estimated his speed going into the circles to be 25mph. She said Kohl was trying to throw them off. He attempted to throw them off the personal watercraft three times before both she and Colombo where thrown overboard. Kohl came back for them. Slagel told Kohl, "Please don't do that to us again. It scared us and your gonna get us hurt. We don't want to get back on so promise us." Kohl replied, "I promise I wont." Slagel said she and Colombo got back on and less than two minutes later Kohl intentionally threw them off again. She said they fell to the rear of the vessel. Slagel said she knew she was hurt but refused to get on the watercraft with him again. Kohl took Colombo to shore and Slagel got a ride on the other watercraft. Slagel said after everyone returned to the camp and the paramedics were called. Kohl made a sarcastic remark about what happened but she couldn't specify what it was. Slagel said she told Kohl that this was his fault and "he acted like he didn't even care and it was no big deal."

### Statement of Megan Colombo/Witness:

Colombo said she did not see the incident but just before Kohl was driving fast. She pointed to a personal watercraft that was traveling about 20mph and said he was going a little faster than that. She estimated Kohl's speed just before the incident at 25mph.

### Statement of Jason Adame/Witness:

Adame told me he saw the incident out of the corner of his eye. He looked over after the girls fell off the watercraft. He said he did not notice Adame driving erratically or doing circles.

### EVIDENCE:

None.

| PREPARED BY (NAME RANK) | DATE | | | ID NUMBER | REVIEWED BY (NAME, RANK) | DATE | | | ID NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| R. OLIVER, P.O. II | 07 | 29 | 2007 | 4446 | | 8 | 6 | 07 | 3590 |

DBW FORM VAR – 2 (1/00)

1.6

VESSEL ACCIDENT REPORT

| SUPPLEMENTAL / NARRATIVE (CHECK ONE) | DATE OF ACCIDENT | TIME (2400) | REPORT NUMBER | CITATION NUMBER |
|---|---|---|---|---|
| X  Narrative Continuation Vessel Accident Report | 07-29-2007 | 1845 | | |
| Supplemental Vessel Accident Report | LOCATION  MISSION BAY/S. PACIFIC PWC AREA | | | BEAT  123 |
| Other | CITY  SAN DIEGO | COUNTY  SAN DIEGO | | AGENCY  S.D. POLICE |

DEPARTMENT OF BOATING AND WATERWAYS    PAGE 7 OF 8

## INJURIES:

Colombo had a torn rectum that extended into the muscle tissue. She had to have both the tissues and muscles repaired surgically. It is estimated that she will need to use a colostomy bag for six months to a year.

Slagel had a six-inch laceration from her rectum to her vagina that required surgery. She is expected to recover in three to six weeks.

Colombo and Slagel's injuries were most likely caused by direct contact or hyper pressure from the jet thrust, expelled from the 130 horse powered engine. Although not common, vaginal and/or rectal injuries have been caused by the jet blast of personal watercraft. This has been documented in many medical journals since at least 1999. For instance, see The Journal of Trauma: Injury, Infection, and Critical Care – Abstract 47(2) August 1999.

Additionally, the manufacturer's website, www.sea-doo.com, cautions "DO NOT APPLY THROTTLE WHEN ANYONE IS AT REAR OF PWC – turn engine off or keep engine at idle. Water and/or debris exiting jet thrust nozzle can cause severe injury." There is also a warning sticker affixed by the manufacturer to the stern of the vessel stating such.

## CONCLUSION:

Kohl intentionally threw Colombo and Slagel overboard. Neither passenger wanted to get back aboard with Kohl. Kohl promised not to throw them overboard, again. Colombo and Slagel got back on the personal watercraft. Kohl intentionally threw them overboard, a second time, causing their injuries.

Kohl was negligent and showed extreme indifference to the physical and psychological well being of the passengers on board. Kohl demonstrated this by repeating the maneuver when told not to do so. Kohl is an adult who is twenty-one years of age. Both his passengers are children under the age of eighteen. Kohl willfully caused both children to be placed in a situation where they were endangered and ultimately caused them great bodily harm.

Pursuant to Title 14, California Code of Regulations, Section 6600.1, the Federal Inland and International Navigation Rules have been incorporated by reference to California law. The following violation of navigational law occurred.

Kohl was operating the personal watercraft at an excessive speed for the turning maneuvers made. He did this intentionally and caused his two passengers to fall overboard.

Kohl violated Title 14, CCR, Section 6600.1, Title 33 USC, Part B:

| PREPARED BY (NAME RANK) | DATE | | | ID NUMBER | REVIEWED BY (NAME, RANK) | DATE | | | ID NUMBER |
|---|---|---|---|---|---|---|---|---|---|
| R. OLIVER, P.O. II | 07 | 29 | 2007 | 4446 | | 8 | 6 | 07 | 3590 |

DBW FORM VAR – 2 (1/00)

17

| VESSEL ACCIDENT REPORT | | DEPARTMENT OF BOATING AND WATERWAYS    PAGE   OF  8 | | |
|---|---|---|---|---|
| SUPPLEMENTAL / NARRATIVE (CHECK ONE) | DATE OF ACCIDENT 07-29-2007 | TIME (2400) 1845 | REPORT NUMBER | CITATION NUMBER |
| X   Narrative Continuation Vessel Accident Report | LOCATION MISSION BAY/S. PACIFIC PWC AREA | | | BEAT 123 |
|   Supplemental Vessel Accident Report | CITY SAN DIEGO | COUNTY SAN DIEGO | | AGENCY S.D. POLICE |
|   Other | | | | |

Rule 6, Safe Speed;

"Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions."
"In determining a safe speed the following factors shall be among those taken into account:"
"(a) By all vessels:
    (i)  the state of visibility;
(ii) the traffic density including concentration of fishing vessels or any other vessels;"


Kohl also violated both state and local laws:

655 H&N (Harbors and Navigation Code) Reckless, negligent operation;

"(a) No person shall use any vessel or manipulate water skis, an aquaplane, or a similar device in a reckless or negligent manner so as to endanger the life, limb or property of any person. The department shall adopt regulations for the use of vessels, water skis, aquaplanes, or similar devices in a manner that will minimize the danger to life, limb, or property consistent with reasonable use of the equipment for the purpose for which it was designed."

63.20.28 SDMC (San Diego Municipal Code) Endangering Aquatic Activities;

"No person shall use any surfboard, paddleboard, belly board, skim board, ski, canoe, boat or vessel of any type, or any similar device in a negligent manner so as to endanger the life, limb or property of another person."

| PREPARED BY (NAME RANK) R. OLIVER, P.O. II | DATE 07 | 29 | 2007 | ID NUMBER 4446 | REVIEWED BY (NAME/RANK) | DATE 8 | 6 | 02 | ID NUMBER 3590 |
|---|---|---|---|---|---|---|---|---|---|
| DBW FORM VAR – 2 (1/00) | | | | | | | | | |

18



Exhibit
2
R. Oliver, 2/26/08

(5) mph from 11 a.m. to 5 p.m.)

(b) November 1st through April 30th - sunrise to sunset.

(3) Waterskiing is prohibited in all other areas of the bay.

(4) In addition to the operator, every vessel towing a skier must have an observer at least 12 years old. The operator must watch ahead, and the observer must watch the skier and advise the operator of any hazards or when the skier falls. All occupants of the boat must remain seated during operation

(5) Waterskiing and similar activities are prohibited between sunset and sunrise.

(6) No waterskier or the towing boat shall operate within 100 ft. of another boat, canoe, paddleboard, float, swimmer or fisherman. Also, no waterskier or the towing boat shall operate within 100 ft. of any beach, except for taking-off landing in the prescribed areas posted for that purpose by the city.

(7) Motorboats in all watersk areas shall adhere to a counterclockwise pattern (turning portleft) at all times.

(8) Observers or operators must signal with a red ski flag in the air whenever there is a person or hazard in the water adjacent to or in the vicinity of their boat. The operator must cut the engine completely when picking up a person from the water into the boat.

(9) Tow lines must not exceed 75 ft. in length.

(10) No person shall use any type of hang glider, parasail, or similar device from the water or land in Mission Bay Park.

(11) No vessel may operate within 200 ft. of the shoreline of an area designed for waterski take-off landing, except a vessel actively involved in towing a waterskier.

(12) Kite Surfing is only allowed in Sail Bay and both North and South Pacific Passage.

## Personal Watercraft (PWC)

Jet Skis, Wet Bikes, Wave Runners, and similar types of watercraft may use any of the boating areas, following all of the regulations for powerboats (100 ft. law is strictly enforced in Mission Bay).

(1) PWC may not be operated after sunset and before sunrise. Operators of PWC equipped with lanyard cutoff switches must attach them to their person and any factory installed self-circling device may not be disabled.

(2) There is a special personal watercraft area at the end of South Pacific Passage where boats are prohibited; however, operators using the area must comply with the no wake zone immediately outside of the area.

length. All boats exceeding 16 ft. in length as well as all power boats must carry a Type IV throwable PFD on board.

(b) Vessels must carry navigation lights for nighttime operation and some sort of sound-signaling device. Powerboats with enclosed fuel compartments are required to have a life extinguisher on board and are generally required to have a muffler, back-fire flame control, and a ventilation system. Most boats are also required to carry Visual Distress Signals on board for emergency use. Boat operators should check with the Lifeguard Service or Coast Guard to determine the specific equipment required for their boat as detailed within Title 14 of the California Code of Regulations for vessels.

(2) Boats must comply with California laws for vessel registration. Basically, all undocumented vessels using or on the waters of California must be currently registered in this State with a few exceptions. Again, boat owners should contact an appropriate agency to determine the specific requirements for their boat.

(3) Vessel registration is performed by the Department of Motor Vehicles, and boat owners should contact their local DMV office for more information.

(4) The boat registration certificate/card is required to be carried on board the vessel at all times, and must be presented to any peace officer upon request.

(5) Age Restrictions

(a) No person may permit any other person under the age of 16 years old to operate any power boat over 15 horsepower or wind powered boat exceeding 30 ft. in length, except for using a dingy between a moored vessel and the shoreline.

(b) The law allows persons 12-15 years of age to operate motorboats of more than 15 horsepower or sailboats over 30 feet if supervised on board by a person at least 18 years of age.

## Reckless, Negligent, and Intoxicated Operation

(1) No person shall use any vessel, or manipulate any waterskis, aquaplane or similar device in a reckless manner so as to endanger the life, limb, or property of any person. Endangerment includes, but is not limited to, the following acts:

(a) riding on the bow, gunwales or transom of a powerboat (without adequate protective railing);

(b) any action causing any waterskis, aquaplane or similar device, or the person thereon to collide with any object or person;

Exhibit 3

R. Oliver, 2/26/08



Exhibit
4
R. Oliver, 2/26/08



Exhibit
5
R. Oliver, 2/26/08



THE CITY OF SAN DIEGO

**PERSONAL WATERCRAFT SPECIAL USE AREA**
RULES AND REGULATIONS

- PERSONAL WATERCRAFT ONLY. NO TOWING OR SWIMMING PERMITTED
  5 MPH FROM SUNSET TO SUNRISE
- NO BUOYS, MARKERS OR OTHER DEVICES ALLOWED AT ANY TIME
  ALL OTHER LOCAL, STATE AND FEDERAL LAWS APPLY
- PERSONAL WATERCRAFT: IS A VESSEL UNDER 13' WITH AN INBOARD MOTOR,
  A WATER JET PUMP, AND IS DRIVEN BY SITTING, STANDING, OR KNEELING.
  THIS DOES NOT INCLUDE VESSELS DRIVEN BY OUTDRIVE, IN-OUT, OR INBOARD DRIVE
  POWER TO WHICH A PROPELLER IS ATTACHED NOR DOES IT INCLUDE TETHERED CRAFTS.
- MAY 1 THRU OCTOBER 31:
  COUNTERCLOCKWISE DIRECTION ONLY
- NOVEMBER 1 THRU JULY 31:
  COUNTERCLOCKWISE DIRECTION IN EFFECT WHEN MORE THAN
  2 PERSONAL WATERCRAFT ARE PRESENT

N

COUNTERCLOCKWISE
DIRECTION

S.D. LIFEGUARD SERVICE - 24 HOURS - 911 OR VHF 16

Exhibit
6
R. Oliver, 2/26/08



Exhibit
7
R. Oliver, 2/26/08



Exhibit
8
R. Oliver, 2/26/08

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| HALEY COLOMBO, by and through her guardian ad litem Sam Colombo; JESSICA SLAGEL, by and through her guardian ad litem Joy Slagel,<br><br>          Plaintiffs,<br><br>vs.<br><br>BRETT KOHL; MISSION BAY JET SPORTS; ROBERT ADAMSON; DOES 1 TO 15,<br><br>          Defendants. | Case No. 37-2007-00077350-CU-PO-CTL |

DEPOSITION OF RENE OLIVER

SAN DIEGO, CALIFORNIA

Tuesday, February 26, 2008

Reported by:  Vanessa R. Caparas, CSR No. 12231

1  influence, various courses of that nature.
2      Q.  Rules of the road?
3      A.  Yes.
4      Q.  Let me reintroduce myself.  My name is Tom
5  Tosdal.  I represent Haley Colombo and Jessica Slagel
6  in a personal injury case, which is now in two
7  different courts.  And this is the opportunity for me
8  and counsel for Mr. Kohl, Paul Kissel, to ask you
9  questions about your personal knowledge about this
10 incident.  You've had your deposition taken before
11 many times?
12     A.  Yes.
13     Q.  Familiar with the procedure?
14     A.  Yes.
15     Q.  We can skip all the preliminary admonitions
16 and stuff?
17     A.  Yes.
18     Q.  Did you become aware of an incident
19 involving Ms. Colombo and Ms. Slagel?
20     A.  Yes.
21     Q.  How?
22     A.  I received a radio call of a vessel accident
23 over in the South Pacific Passage on Mission Bay.
24     Q.  When was that?
25     A.  That was July 29th of 2007 at approximately

1  1830, 45.
2      Q.  About 6:30 or 6:45 in the late afternoon?
3      A.  About.
4      Q.  And was there any further description in the
5  call that you received?
6      A.  No.
7      Q.  Did you proceed to the scene?
8      A.  Yes.
9      Q.  Where was the scene?
10     A.  The scene was in the South Pacific Passage
11 area of Mission Bay specifically by the gazebo across
12 from the south shores boat ramp.
13         MR. TOSDAL:  Let me mark a couple of
14 exhibits.  We'll mark as Exhibit 1 a copy of a vessel
15 accident report.
16     (Exhibit 1 was marked for identification.)
17 BY MR. TOSDAL:
18     Q.  Is this the report that you generated?
19     A.  Yes, that is my report.
20         MR. TOSDAL:  We'll mark as Exhibit 2 a part
21 of a map that I'll show you we have taken from the
22 City of San Diego's Mission Bay Map and Regulations.
23     (Exhibit 2 was marked for identification.)
24 BY MR. TOSDAL:
25     Q.  Are you familiar with this map?

1      A.  Yes.
2      Q.  And does this exhibit, Exhibit 2, accurately
3  depict a part of that map?
4      A.  Yes.
5      Q.  And is the area where you reported and the
6  incident occurred in the area where the wavy white and
7  red lines are?
8      A.  Yes.
9      Q.  And what are the wavy white and red lines?
10     A.  That depicts that regular vessel traffic is
11 restricted.  The only area that is specific
12 special-use area for PWCs, personal watercraft-only
13 area.
14     Q.  Let's explore that a little bit.  The area
15 shown with the red and white wavy lines, is that
16 posted so that all boats and watercraft other than jet
17 skis essentially are prohibited from that area?
18     A.  Yes.  It's posted times two.  The buoys that
19 are strung across the area as you pass into it say "No
20 boats," or something to that effect, so that a normal
21 mariner would understand it.  And then there's signs
22 along the shoreline on the north side that say it's a
23 personal watercraft usage only, and explains what the
24 rules are within that area.
25     Q.  I see two areas here on the map with wavy --

1  and in the photocopy they're black and white lines.
2  There's one to the north of Fiesta Island Road and one
3  to the south.  Which area was it?
4      A.  This was in north Pacific Passage.  PWC-only
5  area.  The other one you're referring to is South
6  Pacific Passage, PWC-only area.
7      Q.  And which is the incident where you
8  reported?
9      A.  North Pacific Passage.
10     Q.  If you'd look at your report to refresh your
11 recollection on that, please.
12     A.  I'm very sorry.  I'm dyslexic.
13     Q.  Okay.
14     A.  I am dyslexic.  South Pacific Passage.
15 Excuse me.
16     Q.  So the incident --
17     A.  Occurred on South Pacific Passage.
18     Q.  All right.  So if we can focus on the South
19 Pacific Passage there, as I understand it, that is
20 posted with signs on the shore as well as signs on the
21 buoys running across the entrance to the area that no
22 boats are to enter and it is restricted to jet ski
23 use; is that right?
24     A.  Yes.
25     Q.  And is there also directional requirement

Page 10

1   that the jet skis travel?
2       A.   It's a counter-clockwise directional
3   requirement. And that is specific to, I believe, if
4   there's more than 20 PWCs in the area.
5           MR. TOSDAL: So let's put the map aside and
6   let's look at a part of the back of the map. We'll
7   mark this as Exhibit 3.
8       (Exhibit 3 was marked for identification.)
9   BY MR. TOSDAL:
10      Q.   I'm going to direct your attention to the
11  lower left-hand corner of the document.
12          There's a legend there that says, "Personal
13  Watercraft, PWC. Jet Skis, Wet Bikes, Wave Runners,
14  and similar types of watercraft may use any of the
15  boating areas, following all of the regulations for
16  powerboats, 100-foot law is strictly enforced in
17  Mission Bay."
18          And if you go down to No. 2, "There is a
19  special personal watercraft area at the end of South
20  Pacific Passage where boats are prohibited; however,
21  operators using the area must comply with the no-wake
22  zone immediately outside of the area."
23          So does that passage I just read apply to
24  this area we've been talking about on the map that is
25  at the end of the South Pacific Passage where use is

Page 11

1   restricted to jet skis?
2       A.   No.
3       Q.   Okay. What does this apply to?
4       A.   That applies to the bay in general. When
5   you have a restricted area that the park director has
6   designated as a special use, which the South Pacific
7   Passage is, the hundred-foot law is not applicable
8   because of the close quarter proximity.
9       Q.   Okay. So the hundred-foot law does not
10  apply to this special-use area; is that right?
11      A.   Unfortunately.
12      Q.   All right. How about Paragraph No. 2 where
13  it says, "There is a special personal watercraft area
14  at the end of South Pacific Passage where boats are
15  prohibited"?
16      A.   Absolutely.
17      Q.   That applies to the area where the incident
18  occurred?
19      A.   Yes.
20          MR. TOSDAL: So let's put that aside. And
21  let me show you what we'll mark as Exhibit 4, which is
22  a photograph.
23      (Exhibit 4 was marked for identification.)
24  BY MR. TOSDAL:
25      Q.   Do you recognize this photograph as a

Page 12

1   photograph taken of the special-use PWC area --
2       A.   Yes.
3       Q.   -- from Fiesta Island Road?
4       A.   Yes, the access road.
5       (Exhibit 5 was marked for identification.)
6   BY MR. TOSDAL:
7       Q.   Let's take a look at Exhibit 5, which is
8   another photograph. And does Exhibit 5 show us a dirt
9   berm, and does that dirt berm form the eastern or
10  northeastern end of the special-use watercraft area?
11      A.   Yes, it does.
12      Q.   And that's the dirt berm over which Fiesta
13  Island Road runs?
14      A.   Yes, the access road to the island.
15          MR. TOSDAL: Thank you. You can put that
16  aside. Let's look at another photograph. We'll mark
17  this as Exhibit 6.
18      (Exhibit 6 was marked for identification.)
19  BY MR. TOSDAL:
20      Q.   Does this photograph show one of the signs
21  that's on Fiesta Island as it faces the special-use
22  personal watercraft area?
23      A.   Faces to the south, yes.
24      Q.   And this defines what a personal watercraft
25  is, which is essentially a jet ski?

Page 13

1       A.   Yes.
2       Q.   Thank you. You can put that aside.
3           So by means of the map, posted signs, the
4   buoys across the mouth of the area, this area is
5   clearly designated as a special-use area limited to
6   jet skis?
7       A.   Clearly.
8       Q.   So do you have a memory of reporting to the
9   scene or responding to the scene?
10      A.   Yes.
11      Q.   Where did you go?
12      A.   We went to the -- directly east of the south
13  shores boat ramp along the shoreline, next to the
14  gazebo in the sand.
15      Q.   And who was there?
16      A.   There were several people there,
17  specifically two young girls that had injuries. And
18  we directed our attention to the young girls with the
19  injuries.
20      Q.   Feel free to refer to your report if you'd
21  like to.
22          Do you have any memory of what the young
23  girls looked like?
24      A.   Haley Colombo and Jessica Slagel. There was
25  also other persons at the scene. Brett Kohl and I

Page 14

1  believe Jason Adame, and Megan Colombo.
2      Q.  Where were the young girls?
3      A.  The young girls were approximately 20 feet
4  up from the high watermark along the beach and the
5  rest of the group was approximately 40 feet up from
6  the high watermark.
7      Q.  Were the young girls standing or sitting or
8  lying?
9      A.  One girl was standing in a bent over
10  position with her hands across her knees at
11  approximately a 90-degree angle.  And the other girl I
12  believe was laying on her back in the sand.
13      Q.  Did the standing girl say anything or make
14  any sounds when you arrived?
15      A.  She was obviously in pain.  She communicated
16  nothing to us other than that she was in extreme pain.
17      Q.  Did you see any blood at that point?
18      A.  There was an extreme amount of blood on the
19  scene.
20      Q.  And could you tell where the blood was
21  coming from?
22      A.  Her rectal orifice injury.  Rectal/vaginal
23  area.
24      Q.  And was the same true for the other girl
25  that blood was coming from the rectal/vaginal area?

Page 15

1      A.  I believe she was being treated and she was
2  on her back, and I saw that there was blood to the
3  left of her in the sand.
4      Q.  And so did you have conversation with the
5  girls --
6      A.  No.
7      Q.  -- at that time?
8      A.  No, they were just communicating that they
9  were in pain, and they were receiving medical
10  assistance from the lifeguards at the time.
11      Q.  Did you have any conversation with anybody
12  else at the scene at that time about what happened?
13      A.  I believe I had a conversation with Brett
14  Kohl and the sister.
15      Q.  Megan?
16      A.  Megan, yes.  And Jason.
17      Q.  Did you recount the conversations that you
18  had with those individuals in your accident report?
19  If you look at --
20      A.  Yes.
21      Q.  -- page 5.
22          What is your procedure for writing your
23  reports with regard to statements?
24      A.  Pretty much after the interview, the initial
25  interview on the scene takes place, we return to the

Page 16

1  office and complete the accident report.
2      Q.  So it's done very close in time?
3      A.  If allowed, yes.
4      Q.  Was this report with regard to the
5  statements written very close in time to your talking
6  to Mr. Kohl?
7      A.  I believe so.
8      Q.  And the same would be true for the other
9  individuals whose statements are reported?
10      A.  Yes.  It would all be done at the same time.
11      Q.  Did you put in your report accurately what
12  Mr. Kohl told you?
13      A.  Yes.
14      Q.  And what did Mr. Kohl tell you?
15      A.  Mr. Kohl told me that he works for Mission
16  Bay Jet Sports; that a perk of the business is that
17  they can take the jet skis after -- I'm sorry, the
18  personal watercraft after hours.  He stated that he
19  was not doing any unusual maneuvers; that he was
20  driving at 5 miles an hour, and he hit a wake, and the
21  girls fell off the back.
22      Q.  And did you make a statement to him about
23  that?
24      A.  Yes.  I told him that basically that's not
25  consistent with the injuries, and I questioned him a

Page 17

1  second and third time, and he told me the same
2  statement again, that he didn't do any erratic
3  movements or cause the girls to fall off the back.
4      Q.  What was his demeanor while you were talking
5  to him?
6      A.  Very suspicious.
7      Q.  Meaning?
8      A.  He didn't seem to be forthcoming.  He didn't
9  elaborate on the questions that I asked him, and he
10  was almost in a -- avoiding me.
11      Q.  Did he express any remorse or sorrow for
12  what had happened?
13      A.  Absolutely not.
14      Q.  Did he express any feeling badly about the
15  injuries to the girls?
16      A.  No.
17      Q.  Did he express any responsibility for what
18  had occurred?
19      A.  No.  What marked me was that he was more
20  concerned with going over to the jet skis that were in
21  the water and washing the blood out of the foot wells
22  and off the seat of the jet skis.
23      Q.  And that's what he told you?
24      A.  That's not what he told me.  That's what I
25  observed and it struck me as unusual.

Page 18

1    Q.  Did Mr. Kohl tell you that both of the jet
2  skis belonged to the owner of Mission Bay Jet Sports
3  Robert Adamson?
4    A.  Yes.
5    Q.  Did Mr. Kohl tell you he had permission from
6  Adamson to have the --
7    A.  Yes.
8    Q.  -- jet skis after hours?
9    A.  Yes.
10    Q.  So let's turn to Megan Colombo, page 6.
11      What did Miss Megan Colombo tell you?
12    A.  She told me that she didn't witness the
13  accident.  And I asked her about how fast that
14  Mr. Kohl had been driving before the accident, and she
15  said she didn't know.  She didn't know how to estimate
16  speed.  So I asked her to point to a personal
17  watercraft that was already in the area that was going
18  about the approximate speed, and she pointed to a
19  vessel that was going about 25 miles an hour.  I'm
20  sorry.  About 25 miles an hour -- she said a little
21  faster than that, so I estimated it at 25.
22    Q.  It being Mr. Kohl's speed at the time of the
23  incident?
24    A.  Yes.
25    Q.  What did Jason Adame tell you?

Page 19

1    A.  He said that he didn't witness the accident,
2  but he saw out of the corner of his eyes that
3  something had occurred, and then looked over
4  afterwards.  And he said he didn't notice that anyone
5  was doing anything erratically or doing anything
6  unusual.  He just witnessed something occurring out of
7  the corner of his eye and then looked over after the
8  fact.
9    Q.  Did you at that time take a look at the jet
10  ski involved in the incident?
11    A.  Yes.
12      MR. TOSDAL:  I'm going to show you a
13  photograph, which we'll mark as Exhibit 7.
14      (Exhibit 7 was marked for identification.)
15  BY MR. TOSDAL:
16    Q.  I'm showing you a photograph of a
17  yellow-colored jet ski that has the name "Sea-Doo" on
18  it.  Is this a photograph of the jet ski?
19    A.  Yes, it is.  It has the same CF numbers,
20  basically the license plate number of the vessel.
21    Q.  And you mentioned that there was blood on
22  the jet ski?
23    A.  Yes.
24    Q.  What did you observe?
25    A.  There were two jet skis involved.  One was

Page 20

1  used to transport the second female back.  Both jet
2  skis, the foot well areas, meaning the areas that your
3  feet are in while you're riding, straddling the ski
4  itself, that area is not self-belling, meaning the
5  water doesn't flow out normally, so it will house
6  probably two to three inches of water unless the
7  vessel is on a plane.  That had about two to three
8  inches of water, seawater in it that was tainted in
9  color with blood.  And it was a lot of blood.  And
10  there was a lot of blood on the seat itself that was
11  draining into the foot wells.
12    Q.  Of both jet skis?
13    A.  Yes.
14      MR. TOSDAL:  All right.  Let me show you a
15  photograph we'll mark as Exhibit 8.
16      (Exhibit 8 was marked for identification.)
17  BY MR. TOSDAL:
18    Q.  Is this a photograph of the subject jet ski
19  and it has part of that foot well shown in the bottom
20  part of the photo?
21    A.  The foot well to the stern, yes.
22    Q.  Did you notice what type of clothing or
23  beachwear Mr. Kohl had on?
24    A.  Not specifically.
25    Q.  Did he have a wetsuit on?

Page 21

1    A.  I don't recall.
2    Q.  How about the girls?  Did they have wetsuits
3  or wetsuit bottoms on?
4    A.  No.
5    Q.  They had basic swimwear?
6    A.  Yes.
7    Q.  So let's go through some of the details of
8  your report here.  Back to page 1.  Did you get the
9  driver's license information and address from
10  Mr. Kohl, from him personally?
11    A.  Yes.
12    Q.  How about the ownership information of the
13  Sea-Doo, where did you obtain that?
14    A.  I did a records check over the radio of the
15  CF number of 8326, Roger, Mary, and it came back
16  registered to Robert Adamson who is known to me as a
17  local personal watercraft rental agency located on
18  Napa.
19    Q.  Do you know Mr. Adamson?
20    A.  I know him personally.
21    Q.  Are you friends with him?
22    A.  I know him business-wise.
23    Q.  Have you ever encountered Mr. Kohl before?
24    A.  No.
25    Q.  At the time, did Mr. Adamson have more than

6  (Pages 18 to 21)

3b908aaa-1c4c-44c1-9c6e-b4838b6d9002

Page 22

1   one employee?
2       A.  Yes.
3       Q.  About how many?
4       A.  I don't know.
5       Q.  Do you know any of them other than Mr. Kohl?
6       A.  No.
7       Q.  Had you seen Mr. Kohl out jet skiing on
8   previous days?
9       A.  Not that I recall.
10      Q.  Have you had any conversation with
11  Mr. Adamson about this event?
12      A.  Yes.
13      Q.  And how many conversations roughly?
14      A.  One.
15      Q.  About when in relationship to the event was
16  that?
17      A.  It was when I went over to the personal
18  watercraft area and impounded the personal watercraft
19  that was involved in the event, and I explained to him
20  the reasons why we were impounding it.
21      Q.  About how long after the July 29th incident
22  was that roughly, if you know?
23      A.  A week or two.
24      Q.  And you went over to precisely where to
25  impound the jet ski?

Page 23

1       A.  To the business itself at 5370 Napa Street
2   in San Diego.
3       Q.  What was the substance of your conversation
4   with Mr. Adamson at that point?
5       A.  I asked him if he was aware of the accident,
6   and he said that he was.  And I said, unfortunately,
7   per the D.A. because the injuries were more severe
8   than first expected, that I would need to impound the
9   personal watercraft as evidence per the District
10  Attorney, and he was very cooperative.
11      Q.  Did you describe to him anything about the
12  incident?
13      A.  I believe I did.  And I also asked him what
14  Mr. Kohl had told him about the accident, and then I
15  handed him a copy of the actual police report of what
16  had indeed occurred.
17      Q.  And you're referring to your own report,
18  Exhibit 1?
19      A.  Yes.
20      Q.  What did he, Mr. Adamson, say Mr. Kohl had
21  told him?
22      A.  That he had been involved in an accident,
23  that the girls had fallen off the back.
24      Q.  Any further detail?
25      A.  No.

Page 24

1       Q.  Did Mr. Adamson say anything else in his
2   conversation with you other than what you've told us?
3       A.  No.  He mostly listened and expressed
4   concern.
5       Q.  Did you describe to him verbally what you
6   had learned Kohl's conduct to have been?
7       A.  No.
8       Q.  In the identification of the watercraft
9   you've listed 130-horsepower.  Where did you get that?
10      A.  From the manufacturer's website.  If you --
11  and also by calling the manufacturer.  If you give
12  them the HIN, otherwise known as a VIN, it's a hull
13  identification number, they will tell you over the
14  phone what the specs of that particular personal
15  watercraft are.
16      Q.  And the estimated speed you've told us you
17  got from a conversation with Ms. Megan Colombo?
18      A.  Yes.
19      Q.  Direction of travel, it's indicated
20  counter-clockwise circles.  Where did you get that
21  information?
22      A.  From the victims.
23      Q.  So let's go down to the bottom of the first
24  page.  There's a little map there.  Did you draw that?
25      A.  Yes.

Page 25

1       Q.  Does that indicate the direction of travel
2   of the subject jet ski?
3       A.  An estimation, yes.
4       Q.  And this little map is in this personal
5   watercraft area of the map that we have as an exhibit
6   here?
7       A.  Yes.  South Pacific Passage personal
8   watercraft.
9       Q.  In the injury descriptions you have for
10  Ms. Colombo, "Torn rectum requiring surgery."  Where
11  did you get that information?
12      A.  From Mrs. Colombo, the mother.
13      Q.  And for Jessica Slagel you have the
14  information, "Torn vagina to rectum requiring
15  surgery."  Where did you get that information?
16      A.  Mrs. Slagel.  Both victims were present in
17  the room during those conversations.
18      Q.  Where did that occur?
19      A.  At the hospital, UCSD.
20      Q.  Were both of them removed from the scene by
21  ambulance?
22      A.  Yes.
23      Q.  So we're looking at the second page now of
24  your report.  Was the weather clear?
25      A.  Yes.

7 (Pages 22 to 25)

3b908aaa-1c4c-44c1-9c6e-b4838b6d9002

Page 26

1    Q.  How was the water?
2    A.  It was choppy.
3    Q.  Wave size?
4    A.  Less than six inches.
5    Q.  Wind?
6    A.  Light.
7    Q.  Lighting conditions?
8    A.  It was daytime.
9    Q.  Visibility?
10   A.  Very good.
11   Q.  Water temperatures?
12   A.  About 72.
13   Q.  And air?
14   A.  About 66.
15   Q.  Now, the type of incident you determined
16  was?
17   A.  It was a falling overboard.
18   Q.  How did you determine that?
19   A.  Based on the victims' statements.
20   Q.  The cause of the accident you determined
21  was?
22   A.  Improper speed.
23   Q.  Based on what?
24   A.  Based on the fact that they fell overboard
25  and they were ejected from the vessels.

Page 27

1    Q.  The operation at the time of the incident
2   you determined was what?
3    A.  Changing direction.
4    Q.  Based on?
5    A.  The victims' statements.
6    Q.  Then did you note any signs of inebriation,
7   consumption of alcohol or drugs of the operator,
8   Mr. Kohl?
9    A.  No.
10   Q.  Did you determine from some source what type
11  of education Mr. Kohl had to operate the jet ski?
12   A.  He says he had informal training, basically
13  word of mouth from other persons.
14   Q.  I see in your report that there are boxes
15  for the American Red Cross education.  Does the
16  American Red Cross train in watercraft operation?
17   A.  I'm not specific -- I don't know about their
18  program.
19   Q.  Does the U.S. Coast Guard Auxiliary train in
20  watercraft operations?
21   A.  Yes, they do.
22   Q.  What's the nature of their training?
23   A.  They have a basic boating course, and it
24  specifically will touch on personal watercraft
25  operation.

Page 28

1    Q.  Does the U.S. Power Squadron have personal
2   watercraft training?
3    A.  Yes, it's comparable to the Auxiliary.
4    Q.  And does the State of California have
5   personal watercraft operation training?
6    A.  Yes.
7    Q.  And what's the nature of that?
8    A.  They have a couple of different courses.
9   They have a booklet that you can read and fill out
10  test questions and receive a certificate, which will
11  say a certificate of completion, which is good for
12  insurance purposes and this and that.  And they have a
13  more extensive course, which I believe is a three-day
14  course.
15   Q.  Did Mr. Kohl describe in any detail what
16  his, quote, informal training had been?
17   A.  No.
18   Q.  Did he ever indicate that he'd taken any
19  kind of a course or read any kind of a booklet?
20   A.  He said he had not.
21   Q.  The operator experience, did Mr. Kohl
22  indicate how much experience he had with a jet ski?
23   A.  Yes.
24   Q.  What did he tell you?
25   A.  He said that he estimated that he had over a

Page 29

1   hundred hours.
2    Q.  Was a condition of the personal watercraft
3   area where the incident occurred such that the
4   counter-clockwise rule was in effect at the time, if
5   you know?
6    A.  I don't recall.
7    Q.  Did you make some determination of where the
8   incident occurred?
9    A.  Yes.
10   Q.  How did you do that?
11   A.  I showed the victims maps of the area, and I
12  asked them to depict what happened by drawing lines on
13  a map, which is something that I do with every
14  accident.  This did not occur at the scene.  This
15  occurred after at the hospital during my followup.
16   Q.  Based on those maps, where did you determine
17  that the accident occurred?
18   A.  Approximately down in the corner of the
19  east -- east area where the turn would be in the
20  counter-clockwise area.
21   Q.  Within the personal watercraft --
22   A.  Yes, in the personal watercraft area.
23   Q.  And so were you the primary investigating
24  officer on this --
25   A.  Yes.

8 (Pages 26 to 29)

3b908aaa-1c4c-44c1-9c6e-b4838b6d9002

Page 30

1    Q.  There's reference to a Sergeant Heacox and
2  Officer Soulia.  What was their role?
3    A.  They just responded to assist me.
4    Q.  When you looked at the subject jet ski, did
5  you notice any damage to the exterior of the craft?
6    A.  No.
7    Q.  All right.  So did you take statements from
8  Ms. Colombo and Ms. Slagel at the hospital?
9    A.  Yes.
10    Q.  We're looking at page 5 and 6.
11        What did Ms. Colombo tell you?
12    A.  She basically said that she did not know
13  Mr. Kohl, that they had been helping someone move, and
14  that he had been a mutual friend of someone else.  And
15  that after the move, that Mr. Kohl suggested that they
16  should all go personal watercrafting after the move,
17  and that they went down -- they agreed and went down
18  to the beach with the other group of friends.  And
19  Mr. Kohl and I believe Mr. Adam -- Adame.
20    Q.  I think it's Adame, but I'm not sure.
21    A.  Adame, A-D-A-M-E.  Went to the personal
22  watercraft rental agency and came down to the beach
23  with two personal watercraft.
24    Q.  And did she -- just to make this easier --
25  did she report to you all of the things that are in

Page 31

1  your report here?
2    A.  Yes.
3    Q.  And you accurately wrote down what she
4  reported to you?
5    A.  Yes.
6    Q.  Now, did Ms. Colombo express to you that it
7  was her belief that Mr. Kohl had intentionally threw
8  her and Ms. Slagel off the watercraft?
9    A.  Absolutely.
10    Q.  Did she tell you why she believed that?
11    A.  Because he had done it a few times before
12  and that she pleaded with him not to do it again.
13    Q.  And he did it again?
14    A.  Yes.
15    Q.  Let's turn to page 6.  Did you take a
16  statement from Ms. Slagel?
17    A.  Yes, I did.
18    Q.  Is that at the same time and place at the
19  hospital?
20    A.  Yes.  It was a different hospital room, but
21  yes.
22    Q.  And did you write down accurately what
23  Ms. Slagel had to tell you?
24    A.  Yes.
25    Q.  And did Ms. Slagel tell you that it was her

Page 32

1  belief that Kohl was trying to throw both of the girls
2  off?
3    A.  Yes.
4    Q.  Did she tell you why she believed that?
5    A.  Because he had done it before and she
6  pleaded with him not to do it again.
7    Q.  And he did it again?
8    A.  Yes, he did.
9    Q.  Did Ms. Slagel describe to you what it was
10  that Mr. Kohl had done at the time that they were
11  thrown off and injured?
12    A.  Yes.  Ms. Slagel has prior experience
13  operating personal watercraft, so she felt what he was
14  doing was unsafe.
15        When they left the beach, in that particular
16  area is a 5-mile area until you get to the personal
17  watercraft-only area, but he left the beach hot or
18  speeding.  And there's a requirement of a hundred feet
19  from the shoreline you must be 5 miles an hour, 5
20  nautical miles an hour or less.  He left the beach hot
21  and he sped all the way across the 5-mile-an-hour area
22  into the personal watercraft area.
23        And then because of the density of the
24  vessels, she felt what he was -- his maneuvers around
25  the other vessels were unsafe, and she said she felt

Page 33

1  extremely unsafe.  What he was doing was unsafe.
2    Q.  And did she describe to you what he had done
3  at the moment they were thrown off the vessel?
4    A.  She said that he was cutting off other
5  personal watercraft in the area, and that he was
6  traveling in excessive speed and then spinning or
7  causing the personal watercraft to spin, which is a
8  game these type of watercraft operators play with
9  intentional effort to throw other people off as fun,
10  as good fun.  But the girls were not experienced
11  enough and were extremely fearful of the operation.
12    Q.  So spinning involves making a sharp turn?
13    A.  Very sharp turns, yes.
14    Q.  And essentially did Ms. Colombo describe to
15  you the same maneuver at the time they fell off?
16    A.  Yes.
17    Q.  That there was a sharp turn to one
18  direction?
19    A.  It was unclear from both of the statements.
20  He had been doing the sharp turns and that's what
21  ejected the girls prior to the incident.  From their
22  statements, it may have been another game that is
23  played is to be on throttle, off throttle, on
24  throttle, off throttle causing eye-popping over wakes.
25  It may have been that at the time the girls fell off

9 (Pages 30 to 33)

3b908aaa-1c4c-44c1-9c6e-b4838b6d9002

Page 34

1  on the incident of the injury that he may have been
2  doing the eye-popping prior to doing a sharp turn.
3      Q.  And eye, is that with the letter "I" or eye
4  as in eyeball?
5      A.  Eye as in eyeball.
6      Q.  How does one eye-pop?
7      A.  You completely are on throttle, then off
8  throttle.  And you time this with a wake or a small
9  wave that's in the water to cause the personal
10  watercraft to jump out of the water and then to
11  immediately -- you're off throttle as it lands.  And
12  then when it lands, you're on throttle and it causes
13  it to jump out of the water, then land again.
14      Q.  So was it clear or unclear to you which
15  maneuver he hit the sharp turn or the eye-popping that
16  was involved at the moment they were injured?
17      A.  Both girls described both things had been
18  occurred, and I believe because of the trauma that was
19  involved they couldn't recollect exactly what maneuver
20  was occurring at the time they were injured.
21      Q.  Can one either do a spin or an eye-pop at
22  five miles an hour?
23      A.  Not a -- a spin cannot be completed at five
24  miles an hour.  An eye-pop, again, involves being on
25  throttle and off throttle.  So as a jet ski is landing

Page 35

1  there is forward momentum, but they're off throttle,
2  so yes.
3      Q.  I see.  Okay.  And when an eye-pop happens,
4  does the jet ski come all the way out of the water?
5      A.  It can.
6      Q.  Did Brett Kohl say whether or not he had
7  made a sharp turn or was doing spinners?
8      A.  No.
9      Q.  Did Brett Kohl say whether or not he was
10  doing eye-pops?
11      A.  No.
12      Q.  Did Brett Kohl say that essentially he was
13  driving at five miles an hour?
14      A.  He insisted.
15      Q.  That he was doing that?
16      A.  Yes.
17      Q.  All right.  Did you do some research with
18  regard to the injuries suffered by these young ladies?
19      A.  Yes.  I'm aware of injuries
20  occurring from the jet blast from jet propelled
21  vessels.  I suspected that is what occurred.  One of
22  the mothers was having extreme amount of difficulty
23  accepting what had happened, so I did the research to
24  put her at ease in an effort to explain to her what
25  had probably occurred.

Page 36

1      Q.  Did you see any physical cuts or bruises or
2  abrasions on either of the young ladies at the scene?
3      A.  No.  They were being attended to by the
4  lifeguards and I stayed out of the way for them to be
5  able to assist the girls.
6      Q.  There's some information here on page 7 of
7  your report, that Colombo had a torn rectum that
8  extended into the muscle tissue, and that she had to
9  have both the tissues and muscles repaired surgically.
10  And it is estimated that she will need to use a
11  colostomy bag for six months to a year.
12          Where did you get that information?
13      A.  From her mother.
14      Q.  Also that Slagel had a six-inch laceration
15  from her rectum to her vagina that required surgery.
16  She is expected to recover in three to six weeks.
17          Where did you get that information?
18      A.  From her mother.  It was her mother that was
19  having difficulty accepting the injury.
20      Q.  So have you seen injuries that you believe
21  came from the jet thrust in other situations?
22      A.  Not to this extent, but I've seen eye
23  injuries, and I personally have experienced losing my
24  own bathing suit bottom.
25      Q.  Were you injured?

Page 37

1      A.  No.
2      Q.  Have you seen either male or female orifice
3  injuries of this nature at any other time?
4      A.  No.
5      Q.  So you went to a medical journal, The
6  Journal of Trauma, to get this information that you
7  report about the incidents of vaginal and/or rectal
8  injuries being caused by the jet blasts of personal
9  watercraft?
10      A.  Yes.  I went to the AMA, American Medical
11  Association, website to try to get some documentation
12  on these types of injuries to put Mrs. Slagel at ease.
13      Q.  And was there any other part of your
14  investigation that we have not covered?  Gone to the
15  scene.  We've talked to the witnesses.  We talked to
16  Mr. Adamson.
17          By the way, did Mr. Adamson tell you that
18  Mr. Kohl did not have permission to use the jet ski?
19      A.  He told me that the employees -- he didn't
20  get specific permission to take the skis at that
21  particular time because he was out of town.  However,
22  it is okay for the employees to take the skis after
23  hours and he wouldn't have had a problem with it.
24      Q.  Did Mr. Adamson indicate to you whether
25  there was -- he had any rules or requirements for how

10 (Pages 34 to 37)

3b908aaa-1c4c-44c1-9c6e-b4838b6d9002

Page 38

1  his employees operated his jet skis?
2      A.  No.
3      Q.  Did he hand you any paperwork that indicated
4  any rules or regulations about that?
5      A.  No.  We produced several years ago --
6  because of the number of incidents occurring in
7  Mission Bay, we produced a videotape and provided it
8  to all of our local personal watercraft rental
9  agencies.  It's about a three-minute videotape of the
10  dos and don'ts on Mission Bay.  And we asked that
11  these rental agencies show this as part of their
12  checkout procedures to all of the renters.
13  Mr. Adamson has been in possession of several of those
14  over the course of the years.
15      Q.  And does that videotape address spinning and
16  eye-popping?
17      A.  It addresses the counter-clockwise
18  directional requirement on Mission Bay and the
19  5-mile-an-hour requirements within a hundred feet of
20  the shoreline or other vessels.  I believe it does
21  address manipulating or turning outside of the
22  counter-clockwise rotation.
23      Q.  Where would I obtain a copy of that
24  videotape?
25      A.  I have one in my office.

Page 39

1      Q.  May we make arrangements to copy it and
2  return it?
3      A.  I will provide you with one.
4      Q.  Thank you very much.
5          So did you as the investigating officer come
6  to any conclusion?
7      A.  Yes.
8      Q.  What was your conclusion?
9      A.  That Mr. Kohl was intentionally playing a
10  game, which is traditionally played with personal
11  watercraft, possibly trying to impress the girls or
12  whatever, by trying to throw them overboard.  And that
13  that particular movement that he was doing caused the
14  girls to come directly off the back of the ski or off
15  the PWC, which would put their vaginal and rectal
16  areas in direct proximity with the jet blast as he was
17  on throttle.
18      Q.  And did you make any recommendation to the
19  District Attorney Office in that regard?
20      A.  I felt that because of the admonishment both
21  girls had given him on the prior incidence about not
22  doing it again and taking them back to the beach, and
23  they were extremely uncomfortable, and they had to get
24  back on the PWC because they were not in close
25  proximity to the beach and wanted to be returned, and

Page 40

1  the fact that he did it again at their insistence not
2  to, that it was an intentional act.  And judging that
3  the girls were minors, in my opinion, I felt it was
4  extremely negligent.
5      Q.  When you say these types of maneuvers, at
6  least -- we don't know precisely what Kohl did -- or
7  do you know precisely what Kohl did to get them off?
8      A.  No, because I wasn't a witness.  But from my
9  expertise I'm going to say that the girls in the way
10  they went off the back, that he was probably off
11  throttle, then on throttle and maybe in a turning
12  maneuver, or not.  But it doesn't matter much if
13  you're on throttle after being off throttle.  The
14  momentum would have caused the girls to go directly
15  back, and one after the other in the same position as
16  they passed through the jet blast would have caused
17  these injuries.
18          So in my opinion, he had been off throttle,
19  which caused them to lurch forward, then was off -- on
20  throttle -- off throttle causing them to lurch
21  forward, then on throttle, which caused them to rock
22  back, and then one after the other to go directly off
23  the skis with their leg in a position where they
24  passed through the jet blast to cause these injuries.
25      Q.  And when someone goes on throttle on a jet

Page 41

1  ski, does the nose of the craft go upwards?
2      A.  Yes, it does.  It causes it to go on a plane
3  extremely fast.
4      Q.  On a plane.  You mean straight ahead?
5      A.  Planing with a vessel means usually at about
6  15 miles an hour or -- when you're on throttle, on any
7  type of vessel, will cause the nose to rise and the
8  nose will be out of the water and it causes the vessel
9  to plane.  So it -- so it can go through the water
10  more efficiently.
11      Q.  Okay.  Thank you.
12          Have you seen other jet skiers do this on
13  throttle/off throttle business?
14      A.  Yes.  All the time.
15      Q.  All right.  And have you seen other jet
16  skiers do the spinning business?
17      A.  All the time.
18      Q.  And does the on throttle/off throttle always
19  result in people falling off?
20      A.  Not always.
21      Q.  Sometimes?
22      A.  Yes.
23      Q.  Does the sharp turn, the spinning business
24  cause people to fall off?
25      A.  The 360s, yes.  Not all the time.  Again,

11 (Pages 38 to 41)

Page 42

1  both of those are a game that's played and the
2  intention is to throw people off in good fun. And so
3  the people in the back are holding on tightly, so
4  sometimes they're ejected and sometimes they're not.
5       Q.  All right. Do you know whether the District
6  Attorney has made a decision with regard to
7  prosecuting Mr. Kohl?
8       A.  No, I don't.
9       Q.  The jet ski, that's the subject jet ski, is
10 presently impounded in your department's storage area?
11      A.  Yes, it is.
12          MR. TOSDAL: That's all the questions I
13 have. Counsel will have some I'm sure.
14
15          EXAMINATION
16 BY MR. KISSEL:
17      Q.  Good morning, Officer Oliver.
18      A.  Good morning.
19      Q.  For the record, my name is Paul Kissel. I
20 represent Brett Kohl in this matter.
21          Do you have an independent recollection of
22 the events of the day of July 29th, 2007?
23      A.  Yes, I do.
24      Q.  I noticed that you asked to read the police
25 report before we started today. When was the last

Page 43

1  time you read it before this morning?
2       A.  Probably last year.
3       Q.  And have you had any contact with the
4  District Attorney's Office regarding this matter?
5       A.  Yes.
6       Q.  When's the last time you had contact?
7       A.  Probably two days ago.
8       Q.  And with whom at the District Attorney's
9  Office?
10      A.  Barbara -- I'm sorry. I don't know her last
11 name.
12      Q.  What is her position there?
13      A.  She's the District Attorney's aide.
14      Q.  And what did you talk about with her?
15      A.  I had received a call from Mr. Tosdal, and I
16 couldn't recall whether he was for the plaintiff or
17 the defendant. And I didn't want to return the call
18 without her permission, so I called and advised her
19 that someone was trying to get ahold of me.
20      Q.  What did it matter to you whether he
21 represented plaintiff or defendant?
22      A.  Neither. I just didn't want to be returning
23 any calls and talking to attorneys without the
24 permission of the District Attorney.
25      Q.  And prior to this occasion a couple of days

Page 44

1  ago, have you had any contact with the District
2  Attorney about this regarding this matter?
3       A.  Not in several weeks.
4       Q.  So several weeks ago you did have some
5  contact?
6       A.  It was all over meeting with attorneys to
7  allow them to view the personal watercraft and trying
8  to schedule that. We had a scheduled appointment that
9  was canceled. Those types of conversation.
10      Q.  Prior to that time any other discussions
11 with the District Attorney's Office?
12      A.  Just on the incident itself.
13      Q.  When's the last time you talked about the
14 specifics of the incident with anyone from the
15 District Attorney's Office?
16      A.  Probably at the very beginning of the
17 investigation.
18      Q.  Was that before or after you completed your
19 report?
20      A.  It would be after.
21      Q.  How long after?
22      A.  Probably within a few days.
23      Q.  Any other discussions with the District
24 Attorney's Office?
25      A.  Just over the incident itself.

Page 45

1       Q.  And what was the discussion regarding the
2  incident with the District Attorney's Office?
3       A.  Just basically the specifics of the accident
4  itself.
5       Q.  What did you discuss as to the specifics?
6       A.  Normally with boating accidents the District
7  Attorneys aren't accustomed to handling these
8  accidents, and they're not familiar with the specifics
9  of the Harbor Navigation Codes and this and that. So
10 normally when we have an accident, we'll call and
11 brief them and inform them of how the laws are
12 applicable, and just point them in the right direction
13 so they understand.
14      Q.  Okay. On how many occasions over the last
15 five years have you worked with the District
16 Attorney's Office in their consideration of
17 prosecution of a matter that you investigated?
18      A.  Probably twice.
19      Q.  And how long have you been assigned to the
20 Mission Bay area?
21      A.  Over 20 years.
22      Q.  Your designation right now is what? I know
23 you're a police officer, but I know you have some
24 subdesignations. You have a specialty out there in
25 the bay; right?

Page 46

1    A.   Right.  I am currently assigned to the
2    Harbor Unit.  There are six officers from the
3    department that have received this specialty and are
4    specifically assigned to the Harbor Unit.  And we
5    basically enforce all the laws and regulations on
6    Mission Bay, all the city lakes, and the ocean.  Three
7    miles out is our jurisdiction, from Point Loma to
8    approximately Del Mar.
9       Q.   Okay.  And this is done from a police car?
10   A.   We have police cars; we have bicycles; we
11   have quads; and we have vessels.
12      Q.   Now, at the time of the incident I guess
13   you're not too far away from where you responded?
14      A.   We were currently patrolling Mission Bay
15   aboard a police vessel.
16      Q.   Via boat?
17      A.   Boat.
18      Q.   What size boat?
19      A.   Approximately 20 to 24 feet.
20      Q.   Couple of outboards?
21      A.   Yes.
22      Q.   Who was with you?  Your partner or assisting
23   officer?
24      A.   Sergeant Heacox.
25      Q.   How long have you been assigned to

Page 47

1    patrolling this type of specialty - the water and
2    lakes, and that type of thing?
3       A.   I've been with the Harbor Unit approximately
4    nine or ten years.
5       Q.   And how much of that time has been spent on
6    Mission Bay?
7       A.   In the summer exclusively.  In the winter,
8    probably 10, 20 percent.
9       Q.   What is your experience, your personal
10   experience with the personal watercraft also called
11   jet skis?
12      A.   I was raised around vessels, sail boats,
13   powerboats.  My parents were actually live-aboards, so
14   from the time I can remember to present, I've always
15   been around vessels.
16      Q.   How about jet skis, though, the kind of
17   vessel that was involved with Mr. Kohl on the day of
18   the incident?
19      A.   The invent of PWCs was about the '80s, the
20   late '80s.  And since then, I've had personal
21   experience with them.
22      Q.   Have you ever driven a jet ski?
23      A.   Oh, yes.
24      Q.   On how many occasions?
25      A.   Numerous.  I have hundreds of hours.

Page 48

1       Q.   How many hundreds?
2       A.   I can't -- I don't know.  Regular trips to
3    the river.  We actually have or had at one point in
4    time two personal watercrafts that were assigned as
5    patrol vessels, and I actually patrolled on personal
6    watercraft in Mission Bay and out in the ocean.
7       Q.   Have you taken any courses specific to
8    operating personal watercraft?
9       A.   Yes.
10      Q.   By the way, for someone operating a personal
11   watercraft, there's no requirement that any Red Cross
12   courses or anything like that be taken, is there?
13      A.   No.
14      Q.   Now, how have you off-duty ever owned a
15   personal watercraft?
16      A.   No.
17      Q.   You mentioned going up to the river, that
18   type of thing.  I guess that would be the Colorado
19   water like Parker Dam or Lake Havasu?
20      A.   Yes.
21      Q.   Who would you go with when you would do that
22   kind of thing?
23      A.   Various friends.
24      Q.   And would you use their personal watercraft?
25      A.   Yes.  We rented them too.

Page 49

1       Q.   And then a part of that fun is to do what
2    you see happening in Mission Bay, is sometimes throw
3    people off, that kind of thing?
4       A.   I've never done that.
5       Q.   When was the last time you for pleasure
6    operated a personal watercraft?
7       A.   About three years ago.
8       Q.   And at that time or prior thereto, what did
9    you do when you went out on personal watercraft?
10      A.   We attach a raft to the back of them, put in
11   coolers, tents and this and that, and we go up to the
12   river and find inlets or private areas and go up in
13   there and camp and play and explore the inlets and
14   things on the watercraft.
15      Q.   Do you ever do any wave jumping on personal
16   watercraft?
17      A.   No.
18      Q.   Ever pull a skier?
19      A.   I don't recall.
20      Q.   Do you ski or water ski?
21      A.   Yes.
22      Q.   One ski?  Slalom?
23      A.   Yes.
24      Q.   Deep-water start?
25      A.   Yes.

SCHULER COURT REPORTING - 858.518.1619

3b908aaa-1c4c-44c1-9c6e-b4838b6d9002

| Page 54 | Page 56 |
|---|---|

**Page 54**

BY MR. KISSEL:

1  BY MR. KISSEL:
2      Q.  Give me your best estimate.  Ten times, 15?
3      A.  I don't know.  Twenty.
4      Q.  Okay.  Have you ever testified in court as a
5  police officer regarding a personal watercraft
6  incident?
7      A.  Yes.
8      Q.  Was that with a citation that you issued?
9      A.  Yes.
10     Q.  How many times has that occurred?
11     A.  Thirty.  I don't know.
12     Q.  So this is where the District Attorney
13  decided to file a case against someone for some kind
14  of infraction or whatnot?
15     A.  My prior testimony?
16     Q.  Yes.  In court.
17     A.  No.  That would be the City Attorney.  City
18  Attorney on just basic speeding violations, this, that
19  or whatever.
20     Q.  Let me ask this:  Have you ever testified in
21  any court regarding a case that you investigated where
22  there was an injury?
23     A.  Yes.
24     Q.  On how many occasions?
25     A.  Five.

**Page 55**

1      Q.  And what types of injuries?
2      A.  One was a boating under the influence where
3  a collision had occurred and the driver did a
4  hit-and-run and I resurrected that scene.  I can't
5  recall the other ones.
6      Q.  What does Mr. Kohl look like?
7      A.  He's a young male, approximately 21, 22
8  years of age, dark hair.  Nothing remarkable.
9      Q.  Stature?
10     A.  Meaning?
11     Q.  How big of a guy one way or the other?
12     A.  Medium.
13     Q.  Now, your report has on it a date of
14  August 6, 2007; correct?
15     A.  Yes.
16     Q.  And that is the date the report becomes
17  filed; is that right?
18     A.  Yes.
19     Q.  And that's because it's reviewed by someone?
20     A.  That's when somebody got around to reviewing
21  it and approved it, yes.
22     Q.  And who was the reviewing officer?
23     A.  Sergeant -- Sergeant Heacox, I believe.
24     Q.  When did you have the report completed?  And
25  that is Exhibit 1 to your deposition.  When was that

**Page 56**

1  done?  Was it the day of July 29, 2007 as it says
2  there or when?
3      A.  What occurred with this particular incident
4  was I didn't have any other incidents occurring that
5  day, so I would have started completing this report on
6  the 29th.  And normally a report of this will take me
7  two to three days to do.
8          And I wouldn't have done anything else but
9  complete this report -- but focus on this report
10  during that time.  I don't believe I had any
11  interruptions when I was completing this one.
12     Q.  How many hours did it take you to complete
13  this report?
14     A.  I don't recall.
15     Q.  Give me your best estimate.
16     A.  With all the research and such -- well,
17  actually, that was after the fact.  Two to three days.
18     Q.  Eight hours a day?
19     A.  Ten hours a day.  And that would entail
20  calling the personal watercraft manufacturer, getting
21  all the specs on the personal watercraft and such.
22     Q.  And you identified a journal article, The
23  Journal Trauma:  Injury, Infection, and Critical Care
24  on page 7 of your report, and also identified the
25  website of the manufacturer of the personal

**Page 57**

1  watercraft.
2          How much time was spent doing that type of
3  research, as you said, because you wanted to put
4  Ms. Slagel's mother at ease?
5      A.  Well, also I completed an initial report,
6  and Sergeant Heacox was also struggling with the
7  findings.  So after the initial report, I added some
8  things into this report based on the documentation
9  that was found.
10     Q.  Are you talking about the general article on
11  the manufacturer's website?
12     A.  Yes.  That originally was not in the report,
13  and Sergeant Heacox wanted me to include that.
14     Q.  Other than that information regarding the
15  journal article and the manufacturer's website, when
16  was the report completed?
17     A.  I don't recall.  Normally it takes me two to
18  three days to do these.
19     Q.  And how much time did you spend researching
20  the journal article and the manufacturer's website?
21     A.  The manufacturer's website was a little more
22  difficult.  Probably I started to do it online and
23  couldn't get what I wanted one day, came back to work
24  the next day and actually called them.  But I
25  immediately found the material I was looking for from

Page 70

1 them, it seemed that their responses were very brief
2 and evasive. It just wasn't appropriate. The
3 demeanor was not appropriate for what was going on.
4    Q. Can you explain to us in any greater detail
5 why you believe Mr. Adame's demeanor was not
6 appropriate that you believe -- why it wasn't
7 appropriate?
8    A. Just from experience from dealing with these
9 and what is normal and customary that I experience.
10 This was different, which caused me to be suspicious.
11    Q. Can you articulate for us what you believe
12 would have been a normal behavior of someone like Mr.
13 Adame?
14    A. Normally when you have people that are
15 injured, especially to this magnitude, you have to
16 pull them away to be able to get to your victims.
17 They're not standing off 50 feet away. It just wasn't
18 appropriate for the situation.
19    Q. When you arrived at the scene, who was
20 around each of the girls?
21    A. Only the lifeguards that were performing
22 medical aid.
23    Q. And they had injuries to private parts of
24 their body, correct?
25    A. It appeared so, but I wasn't in there.

Page 71

1    Q. It would be embarrassing for them, wouldn't
2 you think?
3    A. I couldn't determine what the injuries were
4 because they were fully clothed. I only assumed
5 because of the blood. So I don't think that was a
6 factor. Usually with these accidents, the people are
7 right on top of these people.
8    Q. What were they wearing, the girls wearing?
9    A. I believe they were wearing board shorts.
10    Q. And what type of tops?
11    A. I don't recall.
12    Q. They weren't wearing bikinis?
13    A. I don't recall.
14    Q. So you really don't recall what they were
15 wearing?
16    A. I believe -- all I know is, I couldn't
17 visualize the injuries. So I know they were covered.
18    Q. Whether they had bikinis or a one-piece or
19 shorts on, you would be speculating to tell us that?
20    A. Yes, I would.
21    Q. And what is your understanding as to the
22 degree of friendship between, say, Mr. Kohl,
23 Mr. Adame, and the girls involved in the incident?
24    A. I believe Mr. Adame and Mr. Kohl know each
25 other and are friends. The girls did not know

Page 72

1 Mr. Kohl. Somebody was moving, and that's how the
2 group came together. And they had -- the girls had
3 met them for the first -- or him for the first time.
4 A friend of a friend.
5    Q. And can you describe for us Ms. Slagel's
6 physical appearance?
7    A. Just a normal, you know, 16, 17-year-old
8 girl, not -- just a normal girl.
9    Q. How about for height and weight or anything
10 like that? Can you identify or articulate what you
11 recall about that?
12    A. Not specifically, but normal. Nothing
13 that's marked.
14    Q. Nothing -- not particularly small or large?
15    A. Not for someone of her age, no.
16    Q. How old is she?
17    A. Which one?
18    Q. Slagel.
19    A. I believe 17.
20    Q. Same question with regard to Ms. Colombo.
21 What did she look like, size, height, all that stuff?
22    A. Nothing stands out about her. Normal.
23    Q. And let's go to page 2 of your report. One
24 column is describing the incident as a fall overboard.
25 Does that mean anytime anyone just leaves the craft?

Page 73

1 Is that a fall overboard?
2    A. Yeah. Basically when someone is ejected
3 or -- those are very limited, check the boxes, so
4 you've got to choose something.
5    Q. And the next column over is marked
6 "excessive speed."
7    A. I would say yes, somebody falling overboard
8 was due to excessive speed or lack of speed.
9    Q. How excessive?
10    A. Not appropriate for the conditions if
11 somebody was to fall overboard.
12    Q. What would have been the appropriate speed
13 for the vessel at the time of the incident so either
14 Ms. Colombo or Ms. Slagel would not have fallen
15 overboard?
16    A. If they were in the normal counter-clockwise
17 directional rotation, a vessel of that speed,
18 depending on the conditions. If it was choppy, I
19 would give it five to 10 miles an hour less. It could
20 be 30 miles an hour, 20 to 30 miles an hour.
21    Q. You really don't know the speed at the time
22 they fell off, do you?
23    A. No, I don't.
24    Q. And the girls described a maneuver, and you
25 put it in the chart when you were interviewing them at

Page 74

1  the hospital, and you drew it on the incident report,
2  page 1, of a sharp-turning movement from essentially
3  north going back south, correct?
4      A.  As best as I could estimate, yes.
5      Q.  And the movement that they described here
6  for being thrown off, from what they told you, is
7  being centrifugal force carrying them off the end of
8  the Sea Do as the turning maneuver occurred, correct?
9      A.  They could not pinpoint that.  They just
10 described what had been happening prior to that, that
11 he didn't deviate from the counter-clockwise
12 rotational requirement, but within that requirement,
13 he had been doing spins, and he had been doing the off
14 throttle, on throttle.
15         And they couldn't recollect at the time
16 which maneuver it was, but they know that they were
17 down near that end, and it was prior to them making --
18 it was after them making that corner.
19     Q.  You didn't identify anywhere in your report
20 any eye-popping maneuvers of Mr. Kohl, did you?
21     A.  No, I don't think so.
22     Q.  How many times had the girls been thrown off
23 the personal watercraft before the time they were
24 injured, from what you understood?
25     A.  I believe two.  One or two times.  Enough

Page 75

1  for them to admonish him.
2      Q.  Now, you attribute to Ms. Colombo on page 5
3  of 8 that Mr. -- that from what you were told by her,
4  that Mr. Kohl repeated a turning maneuver to throw
5  them off, correct?
6      A.  Her statement to me was that, yes.
7      Q.  And she didn't mention to you anything about
8  any eye-popping at that time?
9      A.  No, I don't think they know what that was.
10     Q.  And you know that it is enough so if that
11 was an actual course of the vehicle, you would have
12 put it in the report if it was significant; correct?
13     A.  Normally I only put in my report what's
14 stated to me.  I don't speculate.
15     Q.  Okay.  So from what you heard from the
16 girls, any eye-popping, that would be speculation,
17 correct?
18     A.  They didn't specifically tell me that that
19 had occurred.
20     Q.  And they didn't tell you anything to lead
21 you to that conclusion, that there was any eye-popping
22 occurring before the incident, did they?
23     A.  Not specifically in those terms, no.
24     Q.  Now, as to Ms. Slagel on page six of your
25 report, she too said the maneuver that threw them off

Page 76

1  was quick turning, correct?
2      A.  The prior maneuver that threw them off, yes.
3      Q.  Mr. Kohl, when you asked him repeatedly
4  about what happened, he stuck to his story about five
5  miles per hour, correct?
6      A.  Yes, he did.
7      Q.  Do you have any opinion one way or the other
8  that the incident could not have occurred as Mr. Kohl
9  described it?
10     A.  Yes.
11     Q.  And what is that opinion?
12     A.  He had been most probably doing one or two
13 maneuvers, as the girls described what he was doing
14 earlier, which I mentioned before is a game of turning
15 sharp circles.  And when people turn the sharp
16 circles, it creates a wake, a circular wake.  And a
17 lot of times as they're coming out of the sharp
18 circle, that they will hit that wake and they will be
19 on throttle and then off throttle.  And it just
20 enhances the jumping or the eye-popping.
21         When I tried to pin the girls down on what
22 the actual maneuver was, they didn't really have a
23 recollection as probably due to the trauma or
24 something.  So I couldn't get a specific statement
25 from them of what had occurred.

Page 77

1      Q.  Was this the day after the incident?
2      A.  Whenever I went to the hospital.  I'm
3  assuming I went up the next day.
4      Q.  That's your supposition that if their
5  recollection was affected, it was because of the
6  trauma.  They didn't say anything like, oh, gee, I
7  can't remember.  I'm so traumatized or drugged out,
8  anything like that, did they?
9      A.  Well, normally when you interview people at
10 the hospital, they don't recall what specifically
11 happened right around the time of the accident.
12     Q.  So why do you bother to put down what they
13 say, then?
14     A.  Because it's important, and it's their
15 statement.
16     Q.  Have you done any follow-up interviews with
17 them?
18     A.  No.
19     Q.  Does that seem important that you would do
20 that?
21     A.  No.
22     Q.  How close to the jet thrust did the girls
23 have to get to the injury that they sustained?
24     A.  I couldn't -- I'm not an expert.  I don't
25 know.

20  (Pages 74 to 77)

Page 82

1   Q.   Did anyone else have any discussions that
2   you're aware of?
3   A.   I'm sorry.  Would you rephrase that
4   question?
5   Q.   I can't rephrase it, but I'll have it
6   repeated.  I'll ask the court reporter --
7   A.   I did have conversations with Ms. Slagel and
8   Ms. Colombo about what I suspected caused the injuries
9   because they were struggling with it.
10   Q.   In your experience and practice, if someone
11   is operating personal watercraft with passengers and
12   passengers are thrown off for whatever reason, you
13   would not write a ticket typically; right?  Correct?
14   A.   If I witness somebody completing a maneuver
15   that caused them to be thrown off, yes, I would write
16   them a citation.
17   Q.   Did Mr. Kohl receive a citation in this?
18   A.   No.  I didn't witness the maneuver that
19   caused them to fall off.
20   Q.   By the way, as to the blood that you saw on
21   Mr. Kohl's watercraft, you said there was a lot of
22   blood, but there's no way you could quantify exactly
23   how much.
24   A.   No.
25   Q.   And what -- immediately before the girls,

Page 83

1   Ms. Slagel and Ms. Kohl, came off the watercraft --
2   MR. TOSDAL:  You misspoke.  You meant
3   Ms. Colombo.
4   BY MR. KISSEL:
5   Q.   I'm sorry.  Immediately before the girls
6   came off the watercraft before their injuries, what
7   was their seating order on the watercraft?
8   A.   Slagel was seated in the middle, and Colombo
9   was seated to the rear.
10   Q.   When you interviewed Ms. Colombo in the
11   hospital, she told you that she asked Mr. Kohl to
12   please don't do it again, that is, throw them off --
13   throw her off the watercraft; is that true?
14   A.   As she repeated it to me in her statement,
15   she said, I told him, "Please don't do it again.  It
16   hurt.  Please, please."  So I quoted her.
17   Q.   Now, as far as Ms. Slagel, what did she say
18   that she said to Mr. Kohl?
19   A.   I believe the first time he threw her off,
20   she stated that it frightened her and not to do that
21   again.
22   Q.   You have some language you quoted
23   attributable to Ms. Slagel, correct?
24   A.   Oh, yes.
25   Q.   What does that say that she said that she

Page 84

1   told you when you were in the hospital?
2   A.   She -- before she got back on the personal
3   watercraft, she stated to Kohl that she was afraid and
4   that she felt that she could get hurt.  And so she
5   made -- or asked Mr. Kohl to promise that he wouldn't
6   throw them off again.
7   Q.   Well, let's just quote what you said she
8   said.  And that's page 6 of 8.  Tell me if I don't
9   read it correctly.  It says, quote, Please don't do
10   that to us again.  It scared us.  And you're going to
11   get us hurt.  We don't want to get back on, so promise
12   us.
13   That's what you attribute to her, correct?
14   A.   Yes.
15   Q.   And then she told you that Kohl said, quote,
16   I promise I won't, close quote.  Correct?
17   A.   "I promise I won't."  That's what she said.
18   Q.   That's what she said.
19   A.   That's what she said.
20   Q.   What was the sarcastic remark that Kohl
21   supposedly made to Ms. Slagel that you identified in
22   your narrative?
23   A.   That was another suspicious thing is nobody
24   could tell me what that sarcastic remark was.  And I
25   asked, well, why did you feel it was sarcastic?  What

Page 85

1   was the tone of it?  And I couldn't get an explanation
2   for that.
3   Q.   So your opinion is that Mr. Kohl
4   deliberately intended to injure these girls; is that
5   true?
6   A.   No.
7   Q.   What is it?  If that's not true, then what
8   is true?
9   A.   His actions caused the girls to be injured.
10   I believe his intention was all in good fun, but he
11   lacked the experience to know of what the consequences
12   could be.
13   Q.   In your conclusions in the second paragraph,
14   you mentioned that Kohl was negligent and showed
15   extreme indifference.  Indifference is an attitude,
16   last time I checked.  It doesn't really --
17   indifference is not the physical conduct.
18   How did his extreme indifference play in
19   your mind with regard to your finding of negligence?
20   A.   I'm not an English major.  That's the best
21   way that I could express -- if you have an individual
22   who is intentionally doing maneuvers to throw
23   passengers off and the passengers are not on the same
24   page and they dislike what is being done and they
25   express that to that individual, and that individual

SCHULER COURT REPORTING - 858.518.1619

3b908aaa-1c4c-44c1-9c6e-b4838b6d9002